# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 10-269

STATE OF LOUISIANA

VERSUS

BRIAN KEITH THOMAS

**********

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 75061-F
HONORABLE THOMAS F. FUSELIER, DISTRICT JUDGE

**********

## SHANNON J. GREMILLION
## JUDGE

**********

Court composed of Jimmie C. Peters, Billy Howard Ezell, and Shannon J. Gremillion, Judges.

**AFFIRMED.**

**Carey J. Ellis, III**
**La. Appellate Project**
**707 Julia St.**
**Rayville, LA 71269**
**(318) 728-2043**
**Counsel for Defendant/Appellant:**
**Brian Keith Thomas**

**Trent Brignac**
**District Attorney, 13th Judicial District Court**
**P. O. Box 780**
**Ville Platte, LA 70586**
**(337) 363-3438**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**Julhelene E. Jackson**
**Assistant District Attorney, 13th Judicial District Court**
**P.O. Drawer 780**
**Ville Platte, LA 70586**
**(337) 363-3438**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**Brian Keith Thomas**
**Louisiana State Penitentiary**
**Camp J-Gar3A#12**
**Angola, LA 70712**
**Counsel for Defendant/Appellant:**
**Brian Keith Thomas**

**GREMILLION, Judge.**

After a bench trial, Defendant, Brian Keith Thomas, was found guilty of attempted second degree murder. He was sentenced to imprisonment for forty years, at hard labor, without benefit of parole, probation, or suspension of sentence. He has perfected this appeal wherein he alleges insufficient evidence to sustain a verdict of attempted second degree murder and that the sentence is excessive under the circumstances of the case. For the following reasons, we affirm.

## FACTS

In the early morning of October 21, 2007, Defendant and one of his co-defendants, Carvanski Fontenot, exchanged gunfire with persons outside the End Zone Bar in Ville Platte, Louisiana. The victim, Shannon Fontenot, who was also outside the bar, was shot. She survived the shotgun injury.

## ASSIGNMENT OF ERROR NUMBER ONE

Defendant argues that the State failed to prove beyond a reasonable doubt that he possessed or shot a gun on the morning the victim was injured. Defendant argues that it was his co-defendant who shot the victim by accident.

In *State v. Bishop,* 01-2548 (La. 1/14/03), 835 So.2d 434, the defendant argued there was insufficient evidence to sustain his conviction for attempted second degree murder. However, the supreme court affirmed the conviction. Discussing the standard to be used to determine whether the evidence was sufficient, the supreme court stated:

> "In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).... [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier

1

of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville,* 448 So.2d 676, 678 (La.1984).

To sustain a conviction for attempted second degree murder, the state must prove that the defendant: (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim's death. La. R.S. 14:27; 14:30.1. Although the statute for the completed crime of second degree murder allows for a conviction based on "specific intent to kill or to inflict great bodily harm," La. R.S. 14:30.1, attempted second degree murder requires specific intent to kill. *State v. Huizar,* 414 So.2d 741 (La.1982). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La. R.S. 14:10(1); *State v. Butler,* 322 So.2d 189 (La.1975); *State v. Martin,* 92-0811 (La.App. 5 Cir. 5/31/94), 638 So.2d 411.

*Id.* at 437.

Furthermore, as stated by the Louisiana Supreme Court in *State v. Hampton*, 98-331, p. 13 (La. 4/23/99), 750 So.2d 867, 880, *cert. denied,* 528 U.S. 1007, 120 S.Ct. 504 (1999):

A person may be convicted of an offense even if he has not personally fired the fatal shot. The law of principals states that all persons involved in the commission of a crime, whether present or absent, are equally culpable. *See* La. Rev Stat. 14:24. However, the Defendant's mere presence at the scene is not enough to "concern" an individual in the crime. *State v. Schwander,* 345 So.2d 1173, 1174-1175 (La.1977). A principal may be connected only to those crimes for which he has the requisite mental state. *State v. Holmes,* 388 So.2d 722 (La.1980); *State v. McAllister,* 366 So.2d 1340 (La.1978).

"Second degree murder is the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm." La.R.S. 14:30.1(A).

"Attempt" is defined as:

Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

La.R.S. 14:27(A).

2

Finally, a principal is defined as "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." La.R.S. 14:24.

In brief and at trial, Defendant argued that there was continuous acrimony between the co-defendant, Carvanski Fontenot, and another person who was at the bar, Mario Wilson; that it was Fontenot who was firing a gun at Wilson and accidently shot the victim; and that Defendant was simply attempting to keep the peace.

Carvanski Fontenot was the first to testify for the State. He explained that a week prior to the shooting at the End Zone Bar, he and Defendant had a run-in with a man named Raven Gallow. During this particular confrontation, a gold chain was taken from Gallow and Fontenot fired a gun at Gallow's car. Fontenot was arrested and charged with offenses involving this event. Defendant had possession of the gold chain. Fontenot testified that the argument over the gold chain continued until the night of the current shooting when Mario Wilson got involved. At the bar, Gallow began cursing at Fontenot and Wilson stepped in and told Fontenot that they (Fontenot and Defendant) would have to go through him to get to Gallow. Eventually, they all went outside.

Fontenot stated that Defendant had a 9 millimeter gun. Fontenot had a .357 revolver. Fontenot had initially given his gun to Kevin Wilson, who left the gun in a car in a tire store parking lot across the street from the bar. After the two groups of people left the bar and Fontenot and his group crrossed the street, Kevin Wilson gave Fontenot his gun. Mario Wilson and Fontenot continued arguing and at some point,

3

shots were fired from somewhere else. Fontenot testified that both he and Defendant began shooting at Mario Wilson, who was attempting to flee. He said that he heard Defendant fire three or four times, while he fired three times. He saw the victim fall, but stated he did not know from which gun she was shot. He and Defendant then ran behind the tire store where they gave their guns to Defendant's sister and together with Defendant's girlfriend, they all left and drove to his aunt's house. Shortly thereafter, the police arrived and arrested them.

Kevin Wilson was at the bar the night of the shooting. He was also charged with attempted second degree murder as a result of the victim's gunshot injury. He testified that although he knew Fontenot prior to the shooting, he did not know Defendant. He stated he was at the bar with another friend. However, he testified that when Fontenot had asked him to keep his gun, he put the gun in his sister's car, which was parked across the street from the bar. When the argument from the bar came out to the street, he gave the gun to Fontenot upon his request. He said that Defendant and Mario Wilson were arguing over the gold chain. When a gunshot from somewhere else rang out, Defendant and Fontenot began shooting at Mario Wilson. Defendant shot three or four times and Fontenot shot two or three times.

Patricia Eddings, a trace analyst with the Tarrant County Medical Examiner's Office in Fort Worth, Texas, testified that she found gunshot residue on both Defendant's and Fontenot's hands. Craig Nickolas, a detective with the Ville Platte Police Department, applied gunshot residue swab kits to both men shortly after they were arrested the morning of the shooting. Detective Nickolas further testified that he recovered three 9 millimeter casings from the tire store parking lot and recovered the core bullet removed from the victim.

4

Christopher Henderson, a forensic chemist with Acadiana Criminalistic Laboratory analyzed the casings and the core bullet and testified that the casings were fired from the same gun. He stated that the core bullet was consistent with a .38 caliber which included a 9 millimeter, .357, or a .38 special.

Drashandra Thomas, Defendant's first cousin, testified she was at the End Zone Bar when the shooting occurred. She was aware of the animosity between Fontenot and Wilson inside the bar. She stated she was with the victim outside and saw Defendant, Fontenot, Kevin Wilson, and one other person with guns. She said that she saw Defendant's sister give him the gun.

In brief, Defendant argues that Carvanski Fontenot's and Kevin Wilson's testimonies were self-serving as they, too, were charged with the offense of attempted second degree murder, but had not yet been tried. He argues that there was never a gun recovered connected to him and that he was actually attempting to defuse the matter at the time of the shoot-out. Several witnesses testified that he did not have a gun. Kimberly Jack, a jailer with the local marshall's office, was at the bar the morning of the shoot-out. She stated she knew both Defendant and Fontenot and said she did not see anyone with a gun inside the bar. Avery Wilson, the father of the victim's children, stated he saw only Carvanski Fontenot shooting. He initially testified he did not see Defendant in the tire store parking lot, but later stated that he saw Defendant and Fontenot walk together across the street to parking lot. Raven Gallow testified that Defendant gave the gold chain back to him prior to the shoot-out. He stated that although he heard the shots, he did not see who was shooting guns.

Savannah Wilson, Mario Wilson's cousin and Avery Wilson's brother, testified that the problem at the bar was between Carvanski Fontenot and Mario Wilson, and that they had no problem with Defendant. When asked if he saw Defendant with a gun, he replied, "No sir. I ain't seen nobody had a gun." Gene Wilson, Mario Wilson's brother, testified he was at the bar with his girlfriend, Drashandra Thomas. He testified that he saw Fontenot with a gun when the shooting first started, but he did not see Defendant with a gun. He said he grabbed his brother and ran after the first shots rang out.

Finally, Defendant argues Drashandra Thomas's trial testimony was "fraught with inconsistencies and contradictions," and in conflict with her statement given to the police. Further, she admitted to the police she was high on ecstacy at the time of the shooting and at the time she gave her statement. However, Defendant does not point to where her trial testimony was in conflict with her statement to the police. A review of the statement shows that her trial testimony was consistent with her statement in that she named Defendant, Carvanski Fontenot, Kevin Wilson, and one other person as participating in the shoot-out.

Following his discussion of the facts, Defendant concludes in brief, that the State failed to show that he possessed the specific intent to kill Shannon Fontenot; therefore, there was insufficient evidence to support the verdict of attempted second degree murder. However, the State was not required to prove that Defendant had the specific intent to kill the victim. In this case, the State had only to prove that there was specific intent to kill the intended victim, which according to Fontenot's testimony was Mario Wilson. The acrimony between the two men was well-established by both the State's witnesses and Defendant's witnesses.

6

Specific intent may be established by the circumstances surrounding an accused's actions. *State v. Anderson*, 98-492 (La.App. 3 Cir. 10/28/98), 721 So.2d 1006, *writ denied,* 98-2976 (La. 3/19/99), 739 So.2d 781. It is well-settled that the act of pointing a gun at a person and firing the gun is an indication of the intent to kill that person. *State v. Pierre,* 02-277 (La.App. 3 Cir. 6/11/03), 854 So.2d 945, *writ denied,* 03-2042 (La. 1/16/04), 864 So.2d 626; *State v. Reed,* 00-1537 (La.App. 3 Cir. 3/6/02), 809 So.2d 1261, *writ denied*, 02-1313 (La. 4/25/03), 842 So.2d 391; *State v. Clark,* 93-1470 (La.App. 3 Cir. 10/5/94), 643 So.2d 463, *writ denied,* 94-2715 (La. 2/9/95), 649 So.2d 418. Testimony established that each shooter, Defendant and Fontenot, fired their guns three to four times at the intended victim.

Furthermore, its irrelevant that the two men were aiming at Mario Wilson and not the actual victim, the doctrine of transferred intent applies in this case. The third circuit explained transferred intent in *State v. Wright,* 99-1137, p. 11 (La.App. 3 Cir. 3/1/00), 758 So.2d 301, 307, *writ denied,* 00-1614 (La. 3/9/01), 786 So.2d 118, as follows:

> The law of transferred intent was explained by our brethren of the first circuit in *State v. Druilhet,* 97-1717 (La.App. 1 Cir. 6/29/98); 716 So.2d 422, a case similar to the case sub judice. In *Druilhet,* the defendant was charged with aggravated battery and, after a trial by jury, was found guilty of the responsive offense of second degree battery. In his claim that the evidence was insufficient to support his conviction, the defendant argued that he lacked the intent necessary for a conviction of second degree battery because he meant to hit his brother and did not mean to hit or cause serious injury to the victim. The court noted that under the theory of transferred intent, if the defendant possessed the necessary intent to inflict serious bodily injury when trying to hit his brother, but missed and accidentally hit someone else instead, such intent is transferred to the actual victim. *See also State v. Johnson*, 29,629 (La.App. 2 Cir. 8/20/97); 698 So.2d 1051; *State v. Jordan*, 97-1756 (La.App. 4 Cir. 9/16/98); 719 So.2d 556, *writ denied,* 98-2595 (La.1/15/99); 736 So.2d 207. Thus, if the Defendant had the specific intent to stab Searile with the scissors, and inadvertently stabbed

7

Pickney, then the Defendant possessed the necessary intent for the conviction of the second degree battery of Pickney.

*See also, State v. Henderson,* 99-1945 (La.App. 1 Cir. 6/23/00), 762 So.2d 747, *writ denied,* 00-2223 (La. 6/15/01), 793 So.2d 1235, and *State v. Gilliam*, 36,118 (La.App. 2 Cir. 8/30/02), 827 So.2d 508, *writ denied,* 02-3090 (La. 11/14/03), 858 So.2d 422.

Finally, it is of no consequence which man's bullet injured the victim. When the two men began shooting together, they were acting in concert and each became a principal to whatever damage the other's gun inflicted, as each exhibited the requisite mental state to inflict death on the intended victim. Three eyewitness testified that Defendant and Fontenot discharged their guns, aiming for Mario Wilson. The victim, who was standing in the vicinity of the intended victim, was struck by a bullet. The witnesses' testimonies were consistent with each other and with the physical evidence. Both men had gunshot residue on their hands. Considered in a light most favorable to the prosecution, the evidence was sufficient for the trial court to conclude beyond a reasonable doubt that Defendant was guilty of the crime charged.

### ASSIGNMENT OF ERROR NUMBER TWO

Defendant argues that under the circumstances of the case, the sentence of forty years imprisonment is excessive. Furthermore, he argues that because his co-defendant, Carvanski Fontenot, received only a ten year sentence pursuant to a plea agreement, his sentence by comparison constitutes cruel and unusual punishment.

Defendant was convicted of attempted second degree murder, a violation of La.R.S. 14:30.1 and 14:27, which provides for a range of punishment of not less than ten years and not more than fifty years imprisonment, without the benefit of parole, probation, or suspension of sentence. Defendant received forty years.

8

To determine whether a sentence is constitutionally excessive, this court has

stated:

> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, writ denied, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied,* 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*State v. Barling,* 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035,

1042-43, *writ denied,* 01-838 (La. 2/1/02), 808 So.2d 331.

Moreover, in *State v. Smith,* 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d

786, 789, *writ denied,* 03-562 (La. 5/30/03), 845 So.2d 1061, this court held that in

order to decide whether a sentence shocks the sense of justice or makes no

meaningful contribution to acceptable penal goals, the following factors may be

considered:

> [A]n appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith,* 99-0606 (La.7/6/00); 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste,* 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook,* 95-2784 (La.5/31/96); 674 So.2d 957, 958.

9

At the hearing, the trial court stated for the record:

> The Court is called upon to sentence the defendant, Mr. Brian Keith Thomas, who was convicted by this Court of the crime of Attempted Second Degree Murder. In arriving at the sentence, the Court has carefully considered the pre-sentence investigation report, the victim's impact statement, and all of the sentencing guidelines of Louisiana Code of Criminal Procedure Article 894.1. Specifically, the Court considered the fact that the defendant has an extensive criminal record, including at least four other felony convictions which include at least two for violent crimes. In the present case, Mr. Thomas fired his weapon at another individual with total disregard for the welfare of others, striking a pregnant, innocent bystander, causing serious injuries. It is obvious that Mr. Thomas cannot properly function in society and is in need of additional correctional treatment and a custodial environment provided by his commitment to a penal institution. A modest sentence would greatly deprecate the seriousness of defendant's crimes.

Following sentencing, Defendant asked for reconsideration of the sentence, pointing out to the trial court that Carvanski Fontenot received only ten years for his involvement in the shoot-out. While Fontenot was originally charged with attempted second degree murder, under the plea agreement he pled guilty to aggravated second degree battery, which provides for a maximum sentence of fifteen years imprisonment. La.R.S. 14:34.7(B). The trial court denied the motion in open court without giving reasons. In brief, Defendant argues that "[u]nder these circumstances, and considering the disparity in the sentences of Defendant and his co-defendant, forty years does seem to shock one's sense of justice."

In *State v. Dixon*, 03-160, p. 11 (La.App. 3 Cir. 6/4/03), 852 So.2d 471, 478, this court held:

> The sentence imposed on the co-defendant has no bearing on the sentence imposed upon the Defendant. "[I]t is well settled that a sentence must be individualized as to each defendant...." *State v. Williams*, 677 So.2d 692 (La.App. 3 Cir.1996); *State v. Lemelle*, 502 So.2d 130 (La.App. 3 Cir.1987)." *State v. Lofton,* 97-00383 (La.App. 3 Cir. 10/8/97); 701 So.2d 712, 715, *writ denied,* 98-0389 (La.6/5/98); 720 So.2d 679. The disparity in a sentence imposed upon co-defendants

"is only a factor to be considered along with all other appropriate considerations when there is no reasonable basis in the record for the disparity. *State v. Sims,* 410 So.2d 1082 (La.1982)." *State v. Quimby*, 419 So.2d 951, 962 (La.1982).

Considering all of the relevant factors, we find the trial court did not abuse its vast discretion when it sentenced Defendant to forty years imprisonment. The trial court noted for the record that it had taken into consideration the pre-sentence investigation report, which summarized Defendant's background, work history, and family life. The trial court noted that Defendant had an extensive criminal history, including four felonies, two of which were crimes of violence. A review of the record indicates that the trial court took adequate cognizant of the sentencing considerations set out in La.Code Crim.P. art. 894.1. Moreover, Defendant's act of firing into a crowd of people endangered multiple lives, as evidenced by the accidental shooting of a pregnant woman who happened to be in the crowd.

Furthermore, a forty-year sentence for attempted second degree murder is not an uncommon sentence under similar circumstances. In *State v. McCoy,* 34,835 (La.App. 2 Cir. 6/20/01), 792 So.2d 806, *writ denied,* 01-2186 (La. 6/21/02), 818 So.2d 790, the second circuit affirmed a forty-year sentence imposed on the defendant who was convicted of attempted second degree murder despite the fact that he did not have a criminal history. In that case, the defendant had stalked a former girlfriend and laid in wait for her before shooting her four times.

In *State v. Ethridge,* 96-1050 (La.App. 3 Cir. 2/5/97), 688 So.2d 1274, this court affirmed a sentence of forty-five years for attempted second degree murder even though Ethridge had no prior criminal record. The defendant fired six shots into the victim's residence through a bedroom window, severely wounding the victim. In *State v. Owens,* 606 So.2d 876 (La.App. 2 Cir. 1992), Owens alleged his thirty-year

11

sentence for attempted second degree murder was excessive because he was only twenty-five and had no prior criminal history. Owens had fired several shots at the victim in a crowded barroom. The second circuit affirmed the sentence.

Under the circumstances the forty year sentence is not such that would shock this court's sense of justice. Accordingly, there is no merit to Defendant's assertion that his sentence for forty years imprisonment was excessive under the circumstances of the case.

## DECREE

Defendant's conviction and sentence are affirmed.