STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 19-456

STATE OF LOUISIANA

VERSUS

JASON WRIGHT

**********

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 203701-B
HONORABLE WILLIAM J. BENNETT, DISTRICT JUDGE

**********

**JOHN E. CONERY**
**JUDGE**

**********

Court composed of John D. Saunders, Shannon J. Gremillion, and John E. Conery, Judges.

**CONVICTIONS AFFIRMED; SENTENCES AMENDED IN PART; AND CASE REMANDED WITH INSTRUCTIONS.**

**Edward K. Bauman**
**Louisiana Appellate Project**
**Post Office Box 1641**
**Lake Charles, Louisiana  70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Jason Wright**

**Anthony F. Salario**
**Assistant District Attorney**
**12th Judicial District**
**Post Office Box 503**
**Marksville, Louisiana  71351**
**(318) 240-7123**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**CONERY, Judge.**

On November 8, 2017, Defendant, Jason Wright, was charged by bill of information with three counts of attempted first degree murder in violation of La.R.S. 14:27 and 14:30. The victim in each count was accurately described as "a peace officer engaged in the performance of his lawful duties."

On December 29, 2017, Defendant filed a motion to enter dual pleas of not guilty and not guilty by reason of insanity and requested a sanity commission be appointed. On March 15, 2018, the trial court appointed a sanity commission. Both doctors found Defendant was sane and competent to proceed to trial.

On January 16, 2019, a jury found Defendant guilty of the attempted second degree murder of Detective Mike Simmons, as well as the attempted manslaughter of Captain Jeremiah Honea and Detective Casey Threeton. All three convictions were 10-2 verdicts.

On February 11, 2019, Defendant filed a "Motion for Post Verdict Judgment of Acquittal with Incorporated Memorandum of Law." On February 12, 2019, the motion was denied, Defendant waived sentencing delays, and was sentenced to forty years at hard labor without benefit of probation, parole, or suspension of sentence for the attempted murder conviction, and twenty years at hard labor for each count of attempted manslaughter, with all three sentences to run concurrently. Defendant filed a motion to reconsider sentence on February 13, 2019, alleging generally "that the sentence imposed upon him is excessive." The trial court denied Defendant's motion to reconsider sentence on February 14, 2019.

Defendant now appeals his convictions and sentences, alleging four assignments of error: (1) the State failed to prove specific intent to kill Detective Simmons and failed to prove that Defendant's actions were not justified and not

committed in self-defense; (2) the State failed to prove Defendant had specific intent to kill Captain Honea or Detective Threeton; (3) the trial court erred in denying a requested jury charge regarding justification; and (4) his sentences are excessive.

**FACTS:**

As two of Defendant's assignments of error concern the sufficiency of the State's evidence with regard to specific intent, we will highlight the testimony presented at trial. The State's first witness was Detective Mike Simmons of the Avoyelles Parish Sheriff's Office, the victim in count one of the bill of information. Detective Simmons stated he spent sixteen years with the St. Tammany Sheriff's Department before spending the next fourteen years with the Avoyelles Parish Sheriff's Department.

Detective Simmons testified that on September 13, 2017, he was pursuing a Mr. Shawn Morris in connection with several burglary and theft cases he was investigating. After failing to locate Mr. Morris at his grandmother's house, Detective Simmons and a number of other detectives and patrol officers went to the residence of James and Maria Gaspard based on knowledge that Mr. Morris frequented the residence. Detective Simmons testified that he "had recovered stolen property from that residence in the past involving Shawn Morris as well as the occupants or residents." He indicated he was wearing a criminal investigations uniform, which consisted of a tan shirt with a sheriff's officer logo, dress slacks, and a duty belt with his weapon. Although the detectives were in unmarked vehicles, Detective Simmons stated they had marked patrol vehicles with them and the deputies driving those vehicles were in standard uniforms.

Detective Simmons testified that when he, Captain Jeremiah Honea, and Detective Casey Threeton knocked on the door, there was initially no answer

2

although people could be heard moving around inside. At that point, he stated they loudly announced that it was the sheriff's office. Detective Simmons stated they announced themselves several times "because it took awhile for anyone to come and answer the door." Detective Simmons testified he subsequently spoke with Mr. James Gaspard, the owner of the residence, who granted him permission to enter and look for Shawn Morris. Upon entry, Detective Simmons observed there were three or four people in the living room.

Detective Simmons testified that he entered the residence with Captain Honea directly behind him and Detective Threeton bringing up the rear. Detective Simmons stated he followed Mr. Gaspard down a hallway because he was moving "in a very hasty manner." He testified that partway down the hall, he came to a slightly ajar door and pushed the door open while keeping his body out of the doorway. He then testified:

> So[,] as I pushed the door open[,] I saw a subject sitting there with a shotgun. And as the door came all the way open[,] I saw the shotgun level down towards me with the barrel, it wasn't pointed to the left or to the right, it was pointed right at me. And I saw the barrel come down you know pointed right at me.

Detective Simmons clarified the shotgun was initially upright, that he and Defendant saw each other at the same time, then Defendant lowered the shotgun at him. Detective Simmons yelled "gun" to warn Captain Honea and Detective Threeton and drew his weapon, firing two shots as he backed away. At about the same time, the shotgun was discharged and went through the wall inches from where Detective Simmons had been standing. Detective Simmons testified that they then cleared the residence, with only himself and Captain Honea remaining in the living room. They eventually exited the house when Defendant would not surrender

3

himself, although he had surrendered the shotgun by throwing it into the hallway. Detective Simmons testified his involvement with the Defendant ended then.

Detective Simmons stated he had never encountered Defendant prior to September 13, 2017. He said the residence was known for drug activity and moving stolen property. Detective Simmons stated he did not announce the Sheriff's Department's presence once they entered the house, although it had been announced loudly and repeatedly prior to their entrance into the home. He indicated there was about fifteen to twenty seconds between entering the home and the shooting.

The State then called James Gaspard. He testified that his kids woke him up and told him the "cops" were present, so he went to answer the door. Mr. Gaspard was unsure how many people were in the living room of the home but believed there were five. Mr. Gaspard testified that Defendant was living in the second bedroom in the home and stated he had previously told Defendant he could not have guns in the residence because Mr. Gaspard is a convicted felon. He testified he had never before seen the shotgun Defendant fired at law enforcement. He testified he and Detective Simmons were walking together when Detective Simmons opened Jason's door and shoved Mr. Gaspard as shots began to be fired, at which time he ran to his bedroom in the back of the home. He stated he did not know Defendant before one of his kids introduced them and Defendant asked if he could stay with Mr. Gaspard. Mr. Gaspard indicated that Defendant had been living in the trailer awhile before the shooting occurred.

The State then called Temica Littleton, Defendant's former fiancé. Ms. Littleton testified that on the morning of the shooting, she was in bed with Defendant. While in bed, she heard knocking, looked out the window and saw uniformed deputies and sheriff's department vehicles at the scene. She testified she

tried waking Defendant, but he would not wake up initially. She testified she told him the police were there. Ms. Littleton testified she did not see the shotgun until Defendant grabbed it and fired toward the door where Detective Simmons was located. She testified Defendant grabbed the shotgun "as the detective was like coming towards the bedroom door there."

Ms. Littleton stated she did not know Defendant to use or abuse any type of drugs. She testified that when Defendant picked up the gun she yelled "no" because she thought he was going to harm himself, as he had previously told her "he wasn't going back to jail." She stated it was at that time the shots occurred between Defendant and Detective Simmons. Ms. Littleton testified she was right next to Defendant on the bed when she yelled and said Detective Simmons shot first. She also stated that Defendant did not typically grab a shotgun as soon as he woke up and heard people in the hallway.

The State's next witness was Ms. Morgan Murray, a booking officer with the Avoyelles Parish Sheriff's Department. On September 14, 2017, she encountered Defendant during his 72-hour hearing. She testified that when Defendant was informed that he was charged with three counts of attempted first degree murder, he responded that he "only tried to kill one." Ms. Murray testified that her mother, Crystal Brown, was also present and heard Defendant's statement. She acknowledged that the 72-hour hearings were not recorded.

Mrs. Crystal Brown testified that she works for the Avoyelles Parish Sheriff's Department and that 72-hour hearings are held over Skype in her office. Mrs. Brown confirmed that when informed he was facing three counts of attempted murder; Defendant made a statement that he "only tried to shoot and kill one of them."

5

The State then called Detective Randolph Norred, who stated he had been with the Avoyelles Parish Sheriff's Department for five years and a detective for two years. His involvement in the investigation of the September 13, 2017 officer involved shooting was to photograph the crime scene and log in the evidence. Detective Norred discussed the photographs previously entered into evidence in conjunction with the testimony of Detective Simmons. More particularly, he identified in the photographs the area where the shooting took place and noted the evidence of a shotgun blast which went "through and through" the door directly across from the bedroom door where Defendant was located when he fired the shotgun.

Detective Norred further testified in response to a question about whether "the closeness of the range" tells you anything as follows:

> Due to the closeness of the range you can tell that he shot at close range the bullet hadn't had time to expand. In a shotgun the father away you shoot the larger the pattern is going to be being that that's really close, the shotgun never had time to expand.

Counsel for Defendant chose not to cross examine Detective Norred.

The State called Captain Jeremiah Honea, the chief of detectives at the Avoyelles Parish Sheriff's Department, where he had been employed for roughly sixteen years. Captain Honea testified the group of law enforcement officers present at the Gaspard residence included himself, Detectives Mike Simmons, Casey Threeton, Glenn Cammack, Randy Norred, evidence custodian Deputy Jody Carmouche, and two patrol deputies. He confirmed the detectives were in unmarked vehicles while the patrol deputies were in marked cruisers. Captain Honea testified the patrol deputies were wearing body cameras, video from which would be in the

custody of Captain Charles Bryant, the patrol commander. None of the detectives were wearing cameras.

Captain Honea testified that he knocked on the door, as did Detectives Simmons and Threeton, and loudly announced that it was the sheriff's office each time they knocked. Captain Honea remembered three males being in the living room and kitchen area of the trailer upon entrance. He recalled Detective Simmons announcing the sheriff's office's presence upon entry. Captain Honea testified guns are always a danger in mobile homes as, "Most firearms could penetrate the walls or doors in those type structures." Captain Honea gave the following description of the shooting:

> Just as soon as [Detective Simmons] pushed that door open I heard Detective … and I was watching him and watching the doorway because it was kind of both in my field of view. I heard Detective Simmons say gun and I saw him draw his firearm and pretty within [sic] a split second there were three gun shots that went off.

Captain Honea testified he and Detective Simmons retreated down the hall and gave loud commands for the person in the room to come out. He stated Defendant responded loudly saying "he wasn't coming out and he was going to blow the trailer up." Captain Honea confirmed Defendant threw the shotgun out of the room almost immediately after the exchange of gunfire with Detective Simmons.

On cross-examination, Captain Honea stated he could not see Defendant when Detective Simmons opened the door and Defendant could not see him. He again stated Detective Simmons announced their presence upon entry into the home.

The State then called Detective Michael Glenn Cammack of the Avoyelles Parish Sheriff's Department. Detective Cammack testified he had been in law enforcement since 1997 and had been an investigator since 2011. He stated Captain Honea and Detectives Simmons and Threeton were knocking at the front door for

7

roughly five minutes before anyone answered the door. He testified that once the other detectives entered the home, he could no longer hear talking.

Detective Cammack testified that once they heard gunshots, he sent the patrol deputies into the home while he held a white male who came out of the residence at gun point. He stated a few more individuals came out, followed by the detectives who had entered, then eventually Mr. Gaspard, his wife, and another female. After things settled down, Detective Cammack became the lead investigator on the case since he was not inside the trailer during the shooting. Detective Cammack confirmed Detective Simmons fired two rounds from his service weapon.

Detective Cammack testified that he spoke with Defendant two days later "due to him having some illness." Detective Cammack stated that during the interview, Defendant told him he "had it on his mind to commit suicide by cop and admitted that he armed himself and knew officers were in the home." He then testified Defendant claimed he went to put the shotgun down and that was when Detective Simmons shot at him, so he fired back.

The State then called Captain Charles Bryant, the patrol commander for the Avoyelles Parish Sheriff's Department. Captain Bryant verified he is the custodian of body camera footage and verified that State's Exhibit 28 was body camera footage from Lieutenant Scandrich from the morning of the shooting. That footage was then played for the jury. At roughly the 7:55 mark, you can hear a yell and three gunshots in rapid succession. Based upon the sounds of the gunshots captured on the video from the patrol deputies, the shotgun was fired after the two pistol shots. It is unclear from the trial transcript how much of the body camera footage was played, as there is over ninety minutes of video. The remaining hour or more of video related to law

enforcement's efforts to subdue Defendant and remove him from the home following the shooting.

The State then called Detective Casey Threeton of the Avoyelles Parish Sheriff's Department, who stated she has been with the department since 2009. She testified the first person to answer the door, a Mr. Aaron Metrojean, told them there was only one other person in the residence. Upon entering with Mr. Gaspard, they found multiple people in the front area, and Detective Simmons told Detective Threeton to see if one of the individuals had warrants. Detective Threeton testified she was speaking with Larry Metrojean about warrants and was four or five feet behind Captain Honea when Detective Simmons yelled "gun" and began firing his weapon. She testified she pulled her weapon and exited the residence. She acknowledged she could not see Defendant in the room. The State rested after Jody Carmouche, the Avoyelles Parish Sheriff's Department's evidence custodian, identified the shotgun recovered from the residence following the shooting.

Defendant then took the stand on his own behalf. He stated he spent about a year in the Army before being discharged after tearing ligaments in his knee. Defendant stated he has been to prison twice for writing bad checks and he fled parole in Missouri after his release in 2015. He testified he has been a methamphetamine addict since he was fourteen and his paranoia led him "to leave before [his] parole caught up to [him] and put [him] back in prison again." He testified he came to Louisiana in July of 2017 at the suggestion of a distant relative who was dating Larry Metrojean and that he had been renting a room from James and Melissa Gaspard from then until the shooting.

Defendant testified Temica woke him, with difficulty, and was telling him "the people are here, the people are here." He stated he was paranoid because he

knew he had left Missouri illegally, so he grabbed his shotgun without knowing who was in the residence. He testified he lowered his gun after seeing the individual pointing a gun at him, at which point the individual fired twice and he returned fire. Defendant testified he did not know it was the police until they started yelling at him to come out with his hands up because it was the police. He claimed his statement at his seventy-two hour hearing merely meant that he wanted to know why he had three charges when he only saw one person and was the result of him "coming down off of so much meth that [he's] still not real sure what [he's] at."

Defendant acknowledged he may have mentioned "suicide by cop" because the last year of his incarceration was in isolation and he did not want to go back to prison. He stated he did not remember what his intentions were at the time of the shooting, but stated that he was mad at Detective Simmons for missing when he fired at Defendant. Defendant again stated he did not know there was law enforcement at the door and that he was not trying to shoot an officer.

## ERRORS PATENT:

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, there is an error patent concerning Defendant's sentences. Additionally, the trial court minutes of sentencing require correction.

At sentencing, the trial court stated the following regarding diminution of sentence, "I inform you that these crimes are crimes of violence, therefore your sentences are not subject to diminution for good behavior. They are not enhance[d] sentences . . . ."

The trial court's statement could be interpreted as a denial of diminution of sentence. "[A] trial court lacks the authority to grant or deny good time. Except

10

where otherwise provided by law, the provisions of  La. R.S. 15:571.3(C) are directed to the Department of Corrections exclusively, and 'the sentencing judge has no . . . role in the matter of good time credit.'" *State v. Braziel*, 42,668, p. 12 (La.App. 2 Cir. 10/24/07), 968 So.2d 853, 861 (citing *State ex rel. Simmons v. Stalder,* 93-1852 (La. 1/26/96), 666 So.2d 661).  Accordingly, we direct the trial court to amend Defendant's sentences to delete any reference to the denial of diminution of sentence.  The trial court is instructed to make an entry in the minutes reflecting these amendments.  *See State v. Drummer*, 17-790 (La.App. 3 Cir. 6/6/18), 245 So.3d 93, *writ denied*, 18-1139 (La. 2/11/19), 263 So.3d 413.[1]

Next, the court minutes reflect that Defendant's sentences for attempted manslaughter were imposed without the benefit of parole, probation, or suspension of sentence.  However, the sentencing transcript contains no restriction of these benefits.  "[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Accordingly, the court minutes of sentencing must be corrected to delete the denial of these benefits on the two attempted manslaughter convictions.

## ASSIGNMENT OF ERROR NUMBER ONE:

In his first assignment of error, Defendant contends the evidence was insufficient to sustain his conviction for attempted second degree murder because the State did not prove specific intent to kill and did not disprove Defendant's claim

---

[1] Louisiana Code of Criminal Procedure Article 890.1 previously authorized a trial court to deny or restrict diminution of sentence for crimes of violence. However, in 2012, La. Acts. No. 160, the Legislature completely rewrote La.Code Crim.P. art. 890.1.  Consequently, the trial court is no longer authorized to deny or restrict diminution of sentence for crimes of violence.

he fired in self-defense.  With regard to attempted second degree murder, this court has previously stated:

> Thus, although La.R.S. 14:30.1 provides that second degree murder requires "specific intent to kill" *or* "to inflict great bodily harm," in order to be convicted of attempted second degree murder, the State must prove that the defendant had the specific intent to kill.  *State* [*v.*] *Thomas*, 10-269 (La.App. 3 Cir. 10/6/10), 48 So.3d 1210, *writ denied*, 10-2527 (La. 4/1/11), 60 So.3d 1248, *cert. denied*, 565 U.S. 859, 132 S.Ct. 196, 181 L.Ed.2d 102 (2011).  However, that intent may be inferred from the specific circumstances of the offense and the defendant's conduct. *Id*.

*State v. Richardson*, 16-107, p. 6 (La.App. 3 Cir. 12/28/16), 210 So.3d 340, 347.

Additionally, the analysis for insufficient-evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982);  *State v. Moody*, 393 So.2d 1212 (La.1981).  It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review.  *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

As stated above, specific intent to kill may be inferred from the circumstances and Defendant's conduct.  Defendant does not contest the fact that upon awakening he jumped up and immediately armed himself with a 12-gauge shotgun.  Although Defendant contended Ms. Littleton woke him up saying "the people are here," Ms. Littleton testified she woke him up and immediately told him the police were there.  This conflict in testimony presented the jury with a credibility determination as to

which witness was being truthful. Additionally, Detective Simmons testified he reacted to Defendant lowering the barrel of the shotgun towards him while Defendant claimed he only pointed the gun at Detective Simmons after shots were fired. Again, the jury made a credibility determination as to who was being truthful.

Furthermore, two witnesses testified that during his seventy-two hour hearing, Defendant asked why he was facing three counts of attempted murder when he "only tried to kill one." Although Defendant attempted to clarify at trial that he simply meant he only saw one person, he did not contradict the testimony of the witnesses as to the words he used. When asked if he said he was only trying to kill one, Defendant merely responded, "I heard them say that yes."

Finally, this court has previously stated that "It is well-settled that the act of pointing a gun at a person and firing the gun is an indication of the intent to kill that person." *State v. Thomas*, 10-269, p. 7 (La.App. 3 Cir. 10/6/10), 48 So.3d 1210, 1215, *writ denied*, 10-2527 (La. 4/1/11), 60 So.3d 1248, *cert. denied*, 565 U.S. 859, 132 S.Ct. 196 (2011). Viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have inferred Defendant had the specific intent to kill Detective Simmons.

The second half of Defendant's argument is that the State failed to prove Defendant did not act in self-defense. Although Defendant contends the State bore the burden of disproving his claim of self-defense, this court has held a Defendant bears the burden of proving self-defense by a preponderance of the evidence in an attempted murder case:

> Until the Louisiana Supreme Court addresses and resolves the split in the decisions of the appellate court on this issue, we will follow our own well-settled jurisprudence and continue to place the burden of proving justification on the defendant in a non-homicide case. Additionally, this court has held that even when an improper burden of

13

proof may have been imposed on the defendant, courts have been willing to uphold the conviction when the record supported a finding that the defendant did not act in self-defense. *See State v. Heider*, 12-52 (La.App. 3 Cir. 10/3/12), 101 So.3d 1025. As discussed in the previous assignment of error, the record in the present case supports a finding that the defendant did not act in self-defense.

*State v. Ross,* 18-453, p. 35 (La.App.3 Cir. 3/13/19), 269 So.3d 1052, 1074.

While Defendant claims he only shot at Detective Simmons because the detective fired first, the State contends Detective Simmons actually fired in self-defense because Defendant committed an aggravated assault by pointing a gun at Detective Simmons. The Defendant was the only defense witness. His argument for self-defense essentially comes down to his word against the word of Detective Simmons, who testified he only fired his weapon after Defendant aimed the shotgun at him. As no other evidence was presented to support Defendant's claim of self-defense, Defendant failed to prove his self-defense claim when the evidence is viewed in the light most favorable to the prosecution. Furthermore, this court should not disturb the fact-finder's credibility determinations. Accordingly, this assignment of error lacks merit.

**ASSIGNMENT OF ERROR NUMBER TWO:**

In his second assignment of error, Defendant contends the evidence was insufficient to support his convictions for attempted manslaughter of Captain Jeremiah Honea and Detective Casey Threeton, as the State failed to prove he had specific intent to kill either individual. As correctly stated by the Defendant, this court has previously ruled "that attempted manslaughter, as in attempted second degree murder, requires a finding of specific intent to kill, a finding not necessary for a manslaughter conviction." *State v. Porter*, 626 So.2d 476, 478 (La.App. 3 Cir. 1993). Defendant's argument in this assignment of error is that because he could

14

not see Captain Honea or Detective Threeton, or knew they were present outside the door, he could not possibly have had an intent to kill them. Defendant's argument would be logical, but for the law of transferred intent.

In *State v. Wright*, 99-1137, p. 11 (La.App. 3 Cir. 3/1/00), 758 So.2d 301, 307, *writ denied*, 00-1614 (La. 3/9/01), 786 So.2d 118, we stated:

> The law of transferred intent was explained by our brethren of the first circuit in *State v. Druilhet,* 97-1717 (La.App. 1 Cir. 6/29/98); 716 So.2d 422, a case similar to the case sub judice. In *Druilhet,* the defendant was charged with aggravated battery and, after a trial by jury, was found guilty of the responsive offense of second degree battery. In his claim that the evidence was insufficient to support his conviction, the defendant argued that he lacked the intent necessary for a conviction of second degree battery because he meant to hit his brother and did not mean to hit or cause serious injury to the victim. The court noted that under the theory of transferred intent, if the defendant possessed the necessary intent to inflict serious bodily injury when trying to hit his brother, but missed and accidentally hit someone else instead, such intent is transferred to the actual victim.

As noted in the prior assignment of error, the record is sufficient for the jury to have inferred specific intent to kill Detective Simmons. Under the law of transferred intent, the record supports the finding that Defendant's intent to kill Detective Simmons could be transferred to Captain Honea and Detective Threeton. As found by this court in *State v. Dubroc*, 99-730, p. 6 (La.App. 3 Cir. 12/15/99), 755 So.2d 297, 303, "The law does not require that the intent to kill be of a specific victim, but only that the defendant had the intent to kill someone." This assignment of error also lacks merit.

**ASSIGNMENT OF ERROR NUMBER THREE:**

In his third assignment of error, Defendant contends "the trial court erred in failing to give the jury defense counsel's requested charge regarding justification." The Defendant submitted eight separate proposed jury instructions, three of which were granted. Defendant fails to specify which proposed jury instruction he believes

15

was erroneously denied. Defendant argues that "[t]he defense of justification is codified in La.R.S. 14:18, which lists seven circumstances under which the defense can be raised." Trial counsel included the statutory basis for all of his proposed jury instructions, with the exception of the final instruction regarding the burden of proof, which was based on fourth circuit jurisprudence. The only proposed jury instruction which was based upon La.R.S. 14:18 was proposed instruction number 3, which was accepted by the trial court.

The remaining proposed instructions were based upon La.R.S. 14:20, the justifiable homicide statute. The trial court denied these proposed instructions on the grounds there was no homicide at issue. Although Defendant contends the justifiable homicide statute applies to attempts, neither trial counsel nor appellate counsel has cited a single case to support this claim. On the contrary, in *State v. Richardson*, 92-836 (La.App. 5 Cir. 12/14/94), 648 So.2d 945, *writ denied*, 95-343 (La. 6/23/95), 656 So.2d 1011, the fifth circuit specifically found the standard for self-defense that is applicable when a homicide occurs is different than when there is no homicide. The fifth circuit noted "that the charge given by the trial court is not wholly correct because it is based on the standard applicable when a homicide results. However, we believe this error to be harmless." *Id*. at 948. We find this reasoning to be sound and, accordingly, find that the trial court did not err in denying the requested jury instructions 4-7.

The final requested jury instruction stated: "When a defendant asserts self-defense, the State has the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense." This instruction was based upon fourth circuit jurisprudence as stated in *State v. Fluker*, 91-1566 (La.App. 4 Cir. 4/28/93), 618 So.2d. 459. As previously indicated, this court does not follow the same standard as

16

the fourth circuit, as this court has repeatedly held a defendant bears the burden of proving by a preponderance of the evidence that his crime was committed in self-defense in non-homicide cases. *State v. Ross*, 18-453 (La.App. 3 Cir. 3/13/19), 269 So.3d 1052. Indeed, even trial counsel conceded the burden "should be on the defendant to prove by preponderance of the evidence that he acted in self-defense." We find this reasoning to be sound, and, accordingly, it was not error to deny this proposed jury instruction. This assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER FOUR:

In his final assignment of error, Defendant contends the trial court imposed excessive sentences. Louisiana Code of Criminal Procedure Article 881.1 provides the mechanism for preserving the review of a sentence on appeal:

> A. (1) In felony cases, within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.
>
> . . . .
>
> E. Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.

Defendant's motion to reconsider sentence requested that the trial court reconsider his sentence pursuant to La.Code Crim.P. art. 881.1 on the basis that the sentence imposed upon him is excessive. Louisiana courts have laid out the following guidelines with regard to excessive sentence review:

> Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979). In *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331, a panel of this court discussed the review of excessive sentence claims, stating:

17

La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La. 6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57, *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183, (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183. In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061, a panel of this court observed that:

> While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, 958[, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615 (1996)].

*State v. Soileau*, 13-770, 13-771, pp. 4-5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1002,

1005-06, *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261.

Furthermore, in *State v. Baker*, 06-1218 (La.App. 3 Cir. 4/18/07), 956 So.2d 83, *writ denied*, 07-320 (La. 11/9/07), 967 So.2d 496, *writ denied*, 07-1116 (La. 12/7/07), 969 So.2d 626, this court adopted the fifth circuit's three factor test from *Lisotta*, 726 So.2d 57, which established that an appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. Because Defendant's motion to reconsider lacked specificity and merely alleged his sentence was excessive "in light of the facts and circumstances in the instant matter," we will review Defendant's claim as a bare excessiveness claim under *Baker*.

Defendant was convicted of attempted second degree murder, in violation of La.R.S. 14:27 and 14:30.1, as well as two counts of attempted manslaughter, in violation of La.R.S. 14:27 and 14:31. By definition, Defendant's crimes are crimes of violence. Although Defendant claimed self-defense and lack of knowledge of the presence of two of the detectives, there is no question Defendant pointed a twelve-gauge shotgun at Detective Simmons and discharged the weapon. Under La.R.S. 14:27(D)(1)(b), a defendant convicted of attempted murder against a peace officer "shall be imprisoned at hard labor for not less than twenty nor more than fifty years without benefit of parole, probation, or suspension of sentence." Defendant contends in a footnote that he was not charged with attempted murder of a peace officer because the bill of information does not charge him with violating the specific subsection of La.R.S. 14:30 related to the murder of a peace officer. However, the bill specifically described each victim as "a peace officer engaged in the performance of his lawful duties." Furthermore, the trial court instructed the jury regarding specific intent to kill a peace officer or when the intent "is directly related to the victim's status as a peace officer."

Additionally, under La.R.S. 14:27(D)(3), a defendant convicted of attempted manslaughter "shall be fined or imprisoned or both, in the same manner as for the offense attempted; such fine or imprisonment shall not exceed one-half of the largest fine, or one-half of the longest term of imprisonment prescribed for the offense so attempted, or both." Under La.R.S. 14:31(B), "Whoever commits manslaughter shall be imprisoned at hard labor for not more than forty years." Accordingly, the twenty-year sentences Defendant received for his two attempted manslaughter sentences were maximum sentences.

As to the second *Baker* factor, nature of the offender, Defendant admitted at trial that he has been a methamphetamine addict since he was fourteen years old. At the time of the shooting, Defendant was forty-five years old. Defendant was a convicted felon who absconded from parole in Missouri and slept with a shotgun within arms-reach. He also testified that he was coming down from a multi-day methamphetamine binge.

The final *Baker* factor considers sentences imposed in similar circumstances. In support of the forty-year sentence for attempted second degree murder, the trial court cited *State v. Daugherty*, 15-400 (La.App. 3 Cir. 10/7/15), 175 So.3d 1164, where this court affirmed a forty-year sentence for attempted murder. Within the *Daugherty* opinion, numerous cases are cited in which high-end sentences were upheld for attempted second degree murder. These included *State v. Williams*, 11-414 (La.App. 4 Cir. 2/29/12), 85 So.3d 759 (forty-nine-year sentence for first offender), *writ denied*, 12-708 (La. 9/21/12), 98 So.3d 326; *State v. Camese*, 00-1943 (La.App. 4 Cir. 7/11/01), 791 So.2d 173 (maximum sentence for first offender); *State v. Ethridge*, 96-1050 (La.App. 3 Cir. 2/5/97), 688 So.2d 1274 (forty-five-year sentence for first offender).

20

With regard to the two twenty-year sentences for attempted manslaughter, these sentences are maximum sentences. As this court has previously stated, a key aspect of sentencing is that "maximum sentences are reserved for the most serious offenses and offenders." *State v. Morain*, 07-1207, p. 9 (La.App. 3 Cir. 4/2/08), 981 So.2d 66, 72. Nonetheless, maximum sentences have been upheld for attempted manslaughter before. *See State v. Blanche*, 47,014 (La.App. 2 Cir. 4/25/12), 92 So.3d 508; *State v. Maze*, 09-1298 (La.App. 3 Cir. 5/5/10), 36 So.3d 1072; and *State v. Boyd*, 95-1248 (La.App. 4 Cir. 8/28/96), 681 So.2d 396. Although the cited cases involved seriously injured victims, even maximum sentences for attempted manslaughter make no appreciable difference to the amount of time Defendant ultimately spends in prison, as these sentences are running concurrently to Defendant's forty-year sentence without benefits for attempted second degree murder.

In light of the above, this court cannot say the trial court abused its great discretion in sentencing Defendant to forty years at hard labor without benefits for the attempted murder of Detective Simmons, and twenty years at hard labor on each of the two counts of attempted manslaughter, all of which are to run concurrently. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *See State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615 (1996).

## DISPOSITION

For the foregoing reasons, we affirm Defendant's convictions. We amend the Defendant's sentence for attempted second degree murder to delete the denial of diminution of sentence and remand to the trial court with instructions to amend the

21

court minutes accordingly.  Further, we remand this case to the trial court to correct the sentencing minutes to delete the denial of the benefits of parole, probation, or suspension of sentence for Defendant's sentences for attempted manslaughter.

**CONVICTIONS AFFIRMED; SENTENCES AMENDED IN PART; AND CASE REMANDED WITH INSTRUCTIONS.**