# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 12-258

**STATE OF LOUISIANA**

**VERSUS**

**DEXTER HOLDER**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 07-1124
HONORABLE LORI ANN LANDRY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JOHN D. SAUNDERS
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Elizabeth A. Pickett, and James T. Genovese, Judges.

**AFFIRMED.**

**J. Phillip Haney**
**District Attorney, 16th Judicial District Court**
**Angela B. Odinet**
**300 Iberia Street, Suite 200**
**New Iberia, LA 70560**
**(337) 369-4420**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Edward Kelly Bauman**
**La Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT-APPELLANT:**
    **Dexter Holder**

**SAUNDERS, Judge.**

Defendant, Dexter Holder, was charged on June 5, 2007 with armed robbery, a violation of La.R.S. 14:64; attempted second degree murder, a violation of La.R.S. 14:27 and 14:30.1; and two counts of second degree kidnapping, a violation of La.R.S. 14:44.1. The State elected not to prosecute the armed robbery charge.

On June 10, 2009, Defendant filed a motion to enroll as *pro se* counsel and a motion to waive counsel. On July 6, 2009, the trial court conducted a hearing pursuant to *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525 (1975) and denied the motion.

A jury found Defendant guilty of all three remaining charges on October 14, 2009. Defendant was sentenced on March 30, 2010 to twenty-five years at hard labor for attempted second degree murder and ten years at hard labor on each count of second degree kidnapping. The kidnapping sentences were to run concurrently with each other but consecutively to the attempted second degree murder sentence. The State filed its original multiple bill of information on October 16, 2009, but withdrew it at the sentencing hearing on March 30, 2010. The State filed a new multiple bill at the sentencing hearing, and Defendant pled not guilty.

At the multiple offender hearing on March 18, 2011, the trial court accepted evidence of Defendant's criminal history and took the matter of his adjudication under advisement. On July 7, 2011, the trial court found Defendant to be a fourth or subsequent felony offender and vacated the earlier sentence for attempted second degree murder. The trial judge sentenced Defendant "as a fifth felony offender for attempted second degree murder to the mandatory minimum of 50 years with the Department of Corrections at hard labor." She kept intact the two ten-year sentences for second degree kidnapping. The two ten-year sentences,

already adjudicated to run concurrently with each other, are to run concurrently with the fifty-year sentence.

**FACTS:**

On April 27, 2007, Wilson Honore, III saw Defendant "[g]etting through the window" of apartment B-18 of the St. Edwards housing project, "[t]earing the screen down trying to get in." This was the home of Honore's aunt, Linda Jones, who lived there with Defendant's father, Ronnie Merritt, and Defendant. Honore did nothing; he "went on [his] way." Two hours later, after 10:00 p.m., Honore saw Defendant "pass in front [of Honore's] grandfather's house," apartment B-24. Honore was getting out of his van and Defendant "just came on [him,] and [he didn't] know what was wrong." Defendant had two knives in his hand, and "him and his Daddy was getting into it." Honore got out of the van and headed toward his friend's apartment, B-16. Defendant asked Honore "[does he] want some, too?" He approached Honore with the knives but stopped and resumed arguing with Merritt. Honore asked Merritt to handle the situation and take care of his son.

While Defendant and his father argued, Honore watched Defendant go into Merritt's house. Honore went "to the back door of one of [his] partner's house" and knocked on the door. Someone hollered, "he's coming around the corner," and Honore heard gunshots. He turned around and saw Defendant pointing a rifle directly at him and firing it.

Honore "took out running" after the first three shots, and he heard more. One of the shots hit him in the ankle. Although Honore did not know how many shots were fired, he recalled hearing more than five. On June 4, 2009, Honore signed an affidavit prepared by Defendant alleging he wanted to drop the charges against Defendant; he testified at trial he wanted to "[f]orgive and forget." Honore believed the incident was "a misunderstanding or whatever he was going

through . . . an accident to [him] . . . [i]t wasn't meant." Honore admitted, however, the shots did not appear to be accidentally fired.

Earlier in the evening, Honore had seen Defendant with Yolanda Lewis, who he testified was Defendant's girlfriend. They were in the parking lot in front of Merritt's apartment.

Merritt testified as a hostile witness at trial that he "pulled up in [his] car" when Defendant and Honore were arguing. Merritt told Honore "to go ahead on, so it wouldn't be nothing." Honore "stood there for a while" and left after Defendant went into the house.

The next time Merritt saw Defendant, he came up to Merritt's car with a gun. Merritt "dropped [Defendant] off around the corner," and then he heard at least two shots. Defendant returned to the car with the gun. Merritt drove Defendant from the scene and told him he should get rid of the gun because he was going to get in trouble. At trial, Merritt testified he drove Defendant voluntarily and did not feel intimidated by him.

In an audiotape played at trial of a prior conversation between Merritt and the State's attorney, Merritt said Defendant told him he did not know if he hit Honore when he fired the gun. The audiotape also included Merritt saying he would not have driven Defendant away if he had not had a weapon; Merritt feared he might get hurt or killed by Defendant. At trial, however, Merritt testified he did not feel threatened, but did not "trust nobody's gun"; he was not kidnapped. Merritt was "drinking that night and half of the stuff [he didn't] even remember, and "most of [what he testified] is the truth."

Officer Wade Bergeron of the Iberia Parish Sheriff's Office responded to the shooting around 11:15 p.m. on April 27, 2007. He found a very angry and agitated Honore, who said Defendant had shot him. Honore said he thought Defendant may

3

be in building "B" of the housing project. Officer Bergeron found Merritt at that location. He was excited and yelling, and he seemed unwilling to allow them inside. Merritt stated he had been assaulted by Defendant with a knife and then with a gun. He took Defendant around the block in his vehicle; he did not go voluntarily, but rather "[b]ecause he was scared of his life."

After Honore went to the hospital, 911 received a call from someone identified as "Yolanda," who stated Defendant was in the car with her, but "that he had gotten out." Officer Bergeron located the vehicle, and another unit made the traffic stop. Defendant got out of the vehicle and ran. Officer Bergeron identified Defendant as the suspect who was captured after a chase of "a couple of blocks."

Officer Bergeron's police report indicated Merritt told him Defendant forced him with a knife to open his residence. Defendant retrieved a rifle inside and left, then ran to the front of the residence and began shooting at Honore. Defendant then forced Merritt into Merritt's vehicle and told him to drive around the block. After traveling a few yards, Defendant jumped out of the vehicle.

Yolanda Lewis also testified at trial. She and Defendant "became friends and stuff" after meeting at the St. Edwards housing project two to three weeks prior to April 27, 2007. On that date, Lewis left her house and was stopped at a traffic sign when Defendant jumped into her car with a rifle. She testified about what Defendant said:

> He told me something about he got to get away and stuff like that. He got to get back to Mississippi. So I say, "why what's wrong?: I say, "what you doing with that? Why you don't say that?" And I think we left, we rolled a little piece down the street and that's when he said that he had shot somebody and I had to get him back to Mississippi.

Defendant told Lewis he thought he had killed "that m***** f*****." He told her she had to find some money for gas to get him to Mississippi. Lewis thought she would try to get the gun away so he did not kill her, then find a way to get him out

of her vehicle. She persuaded Defendant to "hide the gun in the country by [her] grandmother's house."

Lewis went to her nephew's house to get some money, but he was not at home. All the while, Defendant "was still fussing and kept telling [her] to get, you know, and cursing [her] and telling [her] to get him to Mississippi. . . ." Defendant had no weapons after they left the gun. After they "rode around a long time again," Lewis suggested they go to her friend's house. Defendant told her if she did not do what he told her, "he would hurt [her] family and stuff like that."

Defendant and Lewis went to the home of Lewis's friend; Lewis asked if they could stay for a little while because she was tired. She told her friend she could "take [her] car up town," and the friend went to a club in it. When the friend returned on foot after leaving the car at the club, she told Lewis "[her] car is surrounded by cops," she had heard Defendant had shot someone, and he had to leave her home. Defendant said Lewis was coming with him, and they walked down the street to where the friend had left Lewis's car. The officers were no longer there. As they walked, Lewis "was trying to cry, hoping somebody would see [her]." She passed beside two girls and whispered to them, "he gonna kill me . . . I'm scared," but she did not know if they heard her. Lewis and Defendant rode around in her car again, then went to her mother's house, where Lewis called 911. Her parents were inside the house asleep when she made the call. Lewis cooperated with Defendant because she knew her life was in danger, and she was "scared that he was going to kill [her] . . . with his hand."

After the call, Lewis left in the car with Defendant and drove until she saw a police vehicle's lights behind her. Defendant told her not to stop, but she did anyway; Defendant "took off running out the car."

Defendant threatened Lewis both before and after they left the gun. He told her:

> he knew where [her] people was and he was saying what type of person he is and he say he can, you know, he was going get somebody to hurt us. . . he told [her] he was something about a Vice Lord Disciple or something . . . And something about his horns, that he got 'em, that he have on his forehead.

Defendant told Lewis the Vice Lords were "like a gang, something about gang disciples something, and that he could send people out to hurt [her] and [her] family and all this." Lewis said "[w]hat was intimidating to [her] is the idea that – about the Vice Lord, when he said Vice Lord Disciples and the horns, and he drew this picture" of "four (4) arrows that cross over, but it's like a tail of a devil at the bottom. Each arrow has something different on it." However, she testified she knew about the Vice Lords and the tattoo on Defendant's forehead prior to April 27, 2007. On the night of the incident, "[i]t was the gun that scared of [her] and it was the idea knowing that he was in that type of gang violence." She had not feared the gang violence before because she "thought he was really wanting to make a change." At trial, Lewis did not recall previously telling police she had told Defendant earlier in the day she did not want to have any more to do with him.

After police stopped Lewis's vehicle and Defendant fled, Lewis told Officer Andres Gonzalez she was threatened by Defendant. Officer Gonzalez found the rifle where Lewis said they had left it. DNA testing showed Defendant "could not be excluded as a possible contributor" to DNA on the stock of the rifle, while 96.5% of the African American population could be excluded.

**ASSIGNMENT OF ERROR NO. 1:**

Defendant argues the trial court erred in finding him guilty of the attempted second degree murder and two counts of second degree kidnapping beyond a reasonable doubt. The standard of review in a sufficiency of the evidence claim is

"whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984)). The *Jackson* standard of review does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La. 10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847, 850 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court may intervene in the trier of fact's decision only to the extent necessary to guarantee due process of law. *Pigford*, 922 So. 2d 517.

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than insuring the sufficiency evaluation standard of *Jackson*, "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve "'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown,* 558 U.S. ___, ___, 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v.*

*Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789.

*State v. Strother*, 09-2357, p. 10 (La. 10/22/10), 49 So.3d 372, 378. As such, we must review each charge separately to determine whether the evidence was sufficient to convict Defendant on each count.

*Attempted second degree murder*

"Second degree murder is the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm." La.R.S. 14:30.1. An attempted crime occurs when:

> [a]ny person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object . . . [S]earching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.

La.R.S. 14:27. Specific criminal intent to kill is a required element of the crime of attempted murder. *State v. Butler*, 322 So.2d 189 (La.1975). It "may be established by the circumstances surrounding an accused's actions. It is well-settled that the act of pointing a gun at a person and firing the gun is an indication of the intent to kill that person." *State v. Thomas*, 10-269, p. 7 (La.App. 3 Cir. 10/6/10), 48 So.3d 1210, 1215, *writ denied,* 10-2527 (La. 4/1/11), 60 So.3d 1248, *cert. denied,* __ US ____, 132 S.Ct. 196 (2011) (citations omitted).

Defendant first argued with his father while holding two knives, then he came at Honore with them. Defendant went into his father's house, then came out and pursued Honore with a rifle. Honore saw Defendant point the rifle directly at him while firing it. Defendant fired the rifle at least twice more as Honore ran away from him, striking Honore in the ankle. Honore heard more than five shots fired.

According to Defendant, the fact that he fired multiple shots and only struck Honore once in the ankle indicates he had no specific intent to kill. We find that any of those shots could have struck and killed anyone; the fact Defendant only shot Honore in the ankle could simply indicate he is a poor shot. Defendant pointed a loaded rifle at Honore and fired it while pursuing him, striking him once.

The second circuit, in similar circumstances, inferred the specific intent to kill in *State v. Smith*, 31,955 (La.App. 2 Cir. 5/5/99), 740 So.2d 675, *writ denied*, 00-1404 (La. 2/16/01), 785 So.2d 840. The defendant shot an assault rifle into a house full of children. He knew several children lived in the house, and he saw lights on inside the house when he fired into it. Likewise, this court found the specific intent to kill or harm multiple people in *State v. Brown*, 07-388 (La.App. 3 Cir. 10/3/07), 966 So.2d 1138, *writ denied*, 07-2159 (La. 3/28/08), 978 So.2d 304 *and writ denied*, 08-326 (La. 3/28/08), 978 So.2d 312. Although evidence suggested the defendant intended to harm only one person, he fired a gun toward three who were standing close together. He continued to shoot at them as they fled into the house.

The reasoning of *Smith* and *Brown* applies here. The evidence was sufficient to find Defendant committed attempted second degree murder.

*Second degree kidnapping of Ronnie Merritt*

"[K]idnapping is: (1) The forcible seizing and carrying of any person from one place to another; or (2) The enticing or persuading of any person to go from one place to another. . . ." La.R.S. 14:44.1(B). The crime becomes a second degree offense when "the victim is . . . [i]mprisoned or kidnapped when the offender is armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon." La.R.S. 14:44.1(A)(5).

9

Merritt testified at trial he drove Defendant "around the corner" voluntarily, and he was not intimidated by him. However, the jury heard a recording in which Merritt said he would not have driven Defendant away if he had not been armed. In the recording, Merritt said he felt intimidated, and if he did not drive Defendant, he might be hurt or killed. At trial, Merritt testified he "was drinking that night." Merritt testified he did not feel threatened, but "just wanted to get him away from me" because he did not "trust nobody's gun."

The recording was played but not introduced into evidence at trial. Merritt admitted the voice on the recording was his. The other voice on the recording was not identified. No testimony revealed when, where, or how long after the incident the recording was made.

Without question, Defendant was armed when he got into Merritt's vehicle. Less clear, however, is whether Defendant forcibly seized or carried Merritt away, or enticed or persuaded him to drive away in his vehicle. Nevertheless, the jury heard and considered the evidence, accepted the statement Merritt made on the night of the incident, and rejected his testimony at trial. This court may not disregard the jury's verdict unless it determines a rational jury could not have reached this result. *Leger*, 936 So.2d 170; *Jackson*, 99 S.Ct. 2789.

### *Second degree kidnapping of Yolanda Lewis*

Yolanda Lewis testified she was stopped at a traffic sign when Defendant jumped into her car carrying the rifle. She did not testify Defendant threatened her with the gun, although she said she feared he would have his gang-related friends harm her or her family. Once Lewis persuaded Defendant to leave the gun at her grandmother's property, she was no longer in imminent danger. She drove to her nephew's house seeking money. She rode around with Defendant. She took Defendant to her friend's house, where she lent her car to her friend and stayed

10

there with Defendant to sleep. She took Defendant to her parents' house, where she called 911 but never woke her parents. She voluntarily went back out to the car, where Defendant waited for her, and left with him.

Under these facts, the only period to properly consider for a second degree kidnapping charge is the time from when Defendant got into Lewis's car with the rifle to when they left the rifle behind. Defendant's actions during that period in fact show the forcible seizing and carrying of Lewis from one place to another while armed with a dangerous weapon. Thus, the evidence was sufficient for the jury to find Defendant guilty of the second degree kidnapping of Lewis beyond a reasonable doubt.

## ASSIGNMENT OF ERROR NO. 2:

Defendant contends the trial court erred by not allowing him to represent himself. In his motion to enroll himself as counsel and motion to waive counsel, he alleged his court-appointed attorney was not providing sufficient representation for him.

> An accused has the right to chose [sic] between the right to counsel and the right to self-representation. *State v. Strain,* 585 So.2d 540, 542 (La.1991). An accused, however, will be held to have forfeited the right to self-representation if he vacillates between self-representation and representation by counsel. *United States v. Bennett,* 539 F.2d 45, 51 (10th Cir.1976); *United States v. Frazier–El,* 204 F.3d 553 (4th Cir.), *cert. denied,* 531 U.S. 994, 121 S.Ct. 487, 148 L.Ed.2d 459 (2000). In light of the fundamental significance attached to the right to counsel, the jurisprudence has engrafted a requirement that the assertion of the right to self-representation must be clear and unequivocal. *See* 3 Wayne R. LaFave, Jerold H. Israel & Nancy J. King, *Criminal Procedure* § 11.3(a)(2nd ed. 1999)(noting courts should " 'indulge in every reasonable presumption against waiver' "); *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975); *State v. Hegwood,* 345 So.2d 1179, 1181–82 (La.1977). Requests which vacillate between self-representation and representation by counsel are equivocable [sic]. *Bennett, supra.*

> Whether the defendant has knowingly, intelligently, and unequivocably [sic] asserted the right to self-representation must be determined based on the facts and circumstances of each case. *See*

> *State v. Strain,* 585 So.2d 540, 542 (La.1991)(citing *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)).
>
> Turning to the instant case, we find no merit in defendant's procedural contention that the trial court applied the wrong standard by focusing on his lack of legal experience and no merit in his substantive contention that his request to represent himself was unequivocable [sic].
>
> Procedurally, the trial judge's reasoning, taken as a whole, evidences that he applied the correct legal standard; specifically he stated:
>
> > Well, it's obvious to me that to waive counsel is not in Mr. Bridgewater's best interest. He would not know what he was doing in the conducting of a trial. He has very little legal experience, if any, and I don't believe that the choice would be—he would make would be a *knowing, intelligent choice* being made with his eyes open. So I'm going to deny him his right to or deny the right, his motion to represent himself. (Emphasis supplied).
>
> We are satisfied that the trial judge properly focused on defendant's lack of a "knowing, intelligent choice" as his basis for denying the motion.

*State v. Bridgewater*, 00-1529, pp. 17-18 (La. 1/15/02), 823 So.2d 877, 894-95, *modified on rehearing*, 00-1529 (La. 6/21/02), 823 So.2d 877, *cert. denied*, 537 U.S. 1227, 123 S.Ct. 1266 (2003).

At the *Faretta* hearing on July 6, 2009, Defendant told the trial court he had completed the sixth grade, and he had taught himself to read and write while he was incarcerated. He had no educational background in legal matters other than "[j]ust basically learning what I can do myself." Although Defendant had represented himself in a theft charge in Mississippi, and he first told the trial judge the result was "I got released from court," he actually pled guilty and did not go through a jury trial as he would have to do in this case. He was "kind of" familiar with the rules of criminal procedure. Defendant was unaware the court would not furnish books for him that were unavailable through the jail's law library. Although he planned to call himself as a witness, Defendant did not know how he

12

was going to handle his own questioning; he told the trial judge, "I can question the jury." Defendant had not considered that he did not have the right to say everything he wanted to say at trial. He did not understand that, while he had the right to court-appointed counsel, he did not have the right to counsel of his choice. He felt his counsel "could work better to her capabilities," and he was unhappy that she would not file and/or adopt his *pro se* motions as her own.

The trial judge found Defendant was "not qualified, capable, aware to represent [him]self . . . [He was] not capable to handling this representation and seriousness of this nature." While the trial judge believed Defendant to be intelligent and able to read and write, "that does not mean that [he] understand[s] the impact of representing [him]self." She felt "[h]e is not fully understanding or capable of representing himself for charges that ask for his life," based on "after interrogation, not only the answers that he gave, his posture while giving them, and his insistence every time he is in court to share with this court or anybody who is listening, the things that are inappropriate to be shared at that time."

As in *Bridgewater*, 823 So.2d at 895, Defendant's best interests would not have been served by allowing him to waive counsel. Defendant has very little legal experience and admittedly would not know how to conduct his trial. His demonstrated lack of knowledge of what would be expected and required of him in self-representation prevented Defendant from making a knowing, intelligent choice to waive counsel with his eyes open. In other words, he could not knowingly and intelligently choose to do what he did not know he was choosing to do. Accordingly, we find that this assignment of error lacks merit.

13

## DECREE:

Defendant's convictions for attempted second degree murder and second degree kidnapping, his adjudication as a habitual offender, and his sentences are affirmed.

**AFFIRMED.**