# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**22-350**

**STATE OF LOUISIANA**

**VERSUS**

**ZACKERY SHANE DEVILLE**
**A/K/A ZACKERY DEVILLE**

**\*\*\*\*\*\*\*\*\*\***

**APPEAL FROM THE**
**THIRTEENTH JUDICIAL DISTRICT COURT**
**PARISH OF EVANGELINE, NUMBER 112043-F**
**HONORABLE GARY J. ORTEGO, DISTRICT JUDGE**

**\*\*\*\*\*\*\*\*\*\***

**SHARON DARVILLE WILSON**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Van H. Kyzar, Jonathan W. Perry, and Sharon Darville Wilson, Judges.

**CONVICTION AFFIRMED.**
**SENTENCE VACATED AND CASE**
**REMANDED FOR RESENTENCING.**

**Holli Herrle-Castillo**
**Louisiana Appellate Project**
**Post Office Box 2333**
**Marrero, LA  70073**
**(504) 345-2801**
**Counsel for Defendant/Appellant:**
        **Zackery Shane Deville a/k/a Zackery Deville**

**Trent Brignac**
**District Attorney**
**Thirteenth Judicial District**
**Julhelene E. Jackson**
**Assistant District Attorney**
**Post Office Drawer 780**
**Ville Platte, LA  70586**
**(337) 363-3438**
**Counsel for Appellee:**
        **State of Louisiana**

**WILSON, Judge.**

Defendant, Zackery Shane Deville a/k/a Zackery Deville, appeals his conviction and sentence for the attempted first degree murder of Robert Glenn Leggett (Chief Leggett), who was the Chief of Police of the Village of Turkey Creek. We affirm the conviction; however, because the trial court failed to observe the twenty-four hour sentencing delay required by La.Code Crim.P. art. 873, we vacate the sentence and remand the matter for re-sentencing. Furthermore, Defendant's claim that his counsel was ineffective in failing to argue and call witnesses in support of the defense of voluntary intoxication to negate specific intent to kill is relegated to post-conviction relief.

## I.

## ISSUES

Defendant asserts the following assignments of error: (1) the evidence is insufficient to support his conviction for attempted first degree murder; (2) the trial court erred in denying his motion for continuance; (3) the sentence imposed is excessive; (4) the trial court failed to follow the sentencing delays required by La.Code Crim.P. art. 873; and (5) he did not have effective assistance of counsel.

## II.

## FACTS AND PROCEDURAL HISTORY

Defendant was charged by bill of information with attempted first degree murder of a police officer, in violation of La.R.S. 14:27 and 14:30(A)(2), and criminal trespassing, in violation of La.R.S. 14:63(C), with regard to an incident occurring on March 27, 2018. Defendant pled not guilty and proceeded to trial on January 21, 2020, on the attempted first degree murder charge only. Defendant was found guilty by a unanimous jury verdict. On March 15, 2021, Defendant filed a

motion for new trial and a motion for post-verdict judgment of acquittal. At the sentencing hearing, the trial court took up the two motions and denied them. Then, the trial court sentenced Defendant to forty-five years at hard labor without benefit of probation, parole, or suspension of sentence. The defense made an oral motion for appeal.

On April 14, 2021, Defendant filed a motion to reconsider sentence, which was denied on June 11, 2021. On November 10, 2021, Defendant's written motion for appeal was filed and was granted as an out-of-time appeal on December 13, 2021.

## III.

## <u>ERRORS PATENT</u>

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. We find one error patent involving the bill of information. It does not comply with La.Code Crim.P. art. 464, which provides that the indictment "shall state for each count the official or customary citation of the statute which the defendant is alleged to have violated." In the heading of the bill of information, count one is referred to as "attempted first degree murder," but La.R.S. 14:27, the statute for attempt, is not cited. In the body, count one is referred to as "first degree murder" but is described as an "attempted killing."

The State filed an amended bill of information correcting these errors and omitting the criminal trespassing count. The State withdrew the amended bill of information based on the trial court's indication that Defendant would have to be re-arraigned. The State announced that it would proceed on the original bill of information and sever the misdemeanor criminal trespassing count, which is currently pending trial. Thus, the original bill of information, with the errors contained therein, is still in effect.

2

"Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice." La.Code Crim.P. art. 464. Because Defendant does not allege any prejudice from this error, and we conclude that there is none apparent from this record, we find that it is harmless. *See State v. Allen*, 09-1281 (La.App. 3 Cir. 5/5/10), 36 So.3d 1091.

## IV.

## LAW AND DISCUSSION

### *Sufficiency of the Evidence*

Defendant argues that the evidence was insufficient to uphold his conviction because the State failed to establish the requisite specific intent for attempted first degree murder of a police officer.

The general analysis for insufficiency of the evidence claims is well-established: "the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371. Since the fact finder's role is to "weigh the respective credibility of the witnesses," this court "should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* [*v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781,] standard of review." *Id.* But, for a conviction to be affirmed by this court, "the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt." *Id.*

Kristi King (Kristi) testified that Defendant was her neighbor who lived across the street. Kristi stated that around six p.m. on the date of the incident, she was

3

pulling into her driveway, and noticed that Defendant was standing in the roadway between her house and his house. He was staring at her and her children. Kristi said that she pulled into her driveway and saw Defendant walking towards her house so she led her kids into the house and locked all of the doors. Defendant walked back towards his house. Kristi testified that when she saw Defendant again, "[h]is face was in the glass of my door." Kristi said that Defendant knocked on the door, so she called her husband and her father-in-law. Kristi testified that she did not talk to Chief Leggett that day and that she did not see Defendant stab him.

On cross-examination, Kristi confirmed that Defendant knocked on her door but did not scream, pull on the handle, break the glass, or threaten her.

Terry King (Terry) testified that Kristi is married to his son, Wesley "Bubba" King (Bubba). Terry testified that Kristi called him: "She said that boy was over there, and she told him to leave, and he wouldn't leave. And she had the babies in the bathroom locked up[,] and she was scared." Terry stated that he went over to the house and told Defendant to get out of the yard. On cross-examination, Terry testified that the first time he went to Kristi and Bubba's house, he stood on the front porch of Bubba's house and fired his pistol on the ground because Defendant would not leave. He testified: "I said if you don't get out the yard[,] it's going to get more serious. That's when he left."

After Defendant left the yard, Terry went to city hall and told everyone that there had been a disturbance at Bubba's house. Terry testified that he called the sheriff's department and was told that they would send someone.

Terry said that he returned to Kristi and Bubba's house with help, and they stopped in the road about one hundred yards from Defendant's house. Terry stated that Chief Leggett eventually arrived and went to Defendant's house while Terry

4

and the others watched from the road. Terry said that Chief Leggett went to Defendant's yard and disappeared from view. Sometime later, Defendant took off running, and Terry drove around in his truck to find him. Terry testified that after Defendant stabbed Chief Leggett and ran off, other bystanders pursued Defendant.

Bubba testified that Defendant had lived across the street from him for about a year and that, on more than one occasion, Bubba had told Defendant that he was not welcome on Bubba's property. Bubba said that, on the day of the subject incident, Kristi called and told him that Defendant was beating on their door, so he called the sheriff's office and headed home. Bubba stated that while he did not go onto Defendant's property, he was able to observe Chief Leggett and Defendant until they disappeared behind Defendant's house. They reappeared on the other side of the house where Chief Leggett went down. Bubba said that he was too far away to see the extent of Chief Leggett's injuries.

On cross-examination, Bubba stated that when he arrived at the scene, he heard Defendant say that the house was doused in gasoline and that somebody had a gun. Bubba said that he and several other people chased Defendant after Chief Leggett went down. Bubba said that the group caught up to Defendant and held him on the ground while Defendant was fighting back and trying to get up.

The State then called Chief Leggett to the stand, and he confirmed that he was the chief of police in Turkey Creek on March 27, 2018. Chief Leggett testified that he received a call earlier in the day about Defendant trespassing, so Chief Leggett went over to the property around three p.m. to talk to Defendant, but he was not there. Chief Leggett told Defendant's brother to relay a message to Defendant to stay off the Kings' property and to stop trespassing.

Chief Leggett said that later that day, during the town meeting, he received another call about Defendant, so he left the meeting and went back to the property around six p.m. Chief Leggett said that, at that time, Defendant was walking around his own front yard. Chief Leggett talked to the nearby men, who wanted him to apprehend Defendant. Chief Leggett testified that he left the scene to retrieve his firearm. He was in his marked police car and police uniform. He was made aware by the sheriff's office that there was an arrest warrant for Defendant.

Chief Leggett testified that, when he returned from getting his firearm, Defendant was still walking around in his own front yard. Chief Leggett said that he approached Defendant but that Defendant did not talk to him and kept walking even after Chief Leggett told Defendant that there was a warrant for his arrest. Chief Leggett testified that he tried to take Defendant in without the use of force but that Defendant kept walking around in circles and eventually walked to the back of his house towards the woods to try to leave. Chief Leggett followed Defendant and tried to apprehend and handcuff him, but Defendant pulled his arm loose and struck Chief Leggett with something that Defendant had in his hand. Chief Leggett said that he was cut on the left side of his face and by his left collar bone. Chief Leggett testified that he knew his injury was "bad" because, when he put his hand up, he "felt the blood just gushing out[,]" and his fingers went inside the cut. Chief Leggett said that he went down and "figure[d] it was over . . . I didn't know what was going to happen to me." Chief Leggett said that he believed that he was going to die.

The State introduced the photographs of Chief Leggett's injuries, and Chief Leggett confirmed that the photographs depicted the left side of his face with the cut and the uniform that he was wearing that night. He testified that the photographs also showed that he was being treated by emergency services. Chief Leggett

6

confirmed that he had to be air lifted to the trauma room in Alexandria, where he underwent surgery and was told that he lost a large amount of blood.

Chief Leggett testified that the doctors started him on exercises for his face because the muscle was cut in half, all the nerves were damaged, and he could not fully close his left eye. Chief Leggett confirmed that, at the time of trial, he was still unable to properly close his eye. He testified that he had trouble chewing because of the damaged muscle, that he is on continued medication for his nerves, that the pain is unbearable without medicine, and that he hardly sleeps at night.

On cross-examination, Chief Leggett confirmed that when he first arrived, Defendant was not threatening anyone and was walking back and forth in his own yard. Chief Leggett said that he was the only officer on the scene.

Joshua Rollins (Rollins) testified that he lived next door to Defendant and across the street from Bubba and Kristi. Rollins said that he was home on the day of the incident and was aware of it because he observed a police car and people in the street. Rollins said that he stayed on his property and only went over to Defendant's yard once Chief Leggett was injured. Rollins said that he observed "a tussle" between Defendant and Chief Leggett. He saw Defendant land a striking blow on Chief Leggett and run off. Rollins said that Chief Leggett was cut along his jaw and neck area. Rollins said that he needed towels to keep pressure on Chief Leggett's wound because there was so much blood and that Chief Leggett was getting "woozy."

On cross-examination, Rollins said that he could see the rear of Defendant's house because there was no obstruction blocking his view. Rollins confirmed that he called emergency services and then handed the phone to his fiancée while he kept pressure on Chief Leggett's wound. Rollins stated that he did not remember

7

everything he said on the 911 call, which was played for the jury during his testimony, because he was so worried about helping Chief Leggett.

The State then called Kari Hogan (Hogan) to the stand. Hogan testified that she heard a commotion on the evening of the incident, so she walked to her front porch to observe and saw Defendant walking around his front yard and then walking around the back of his house. Hogan said that she observed Chief Leggett and Ducote, a local councilman, approach Defendant. She testified that Defendant "spun around and cut the cop . . . and took off running." Hogan said that she called for Rollins, who checked on Chief Leggett and asked for towels. Hogan testified that she told the 911 operator that Chief Leggett's blood was pouring out.

On cross-examination, Hogan said that she did not see Defendant repeatedly stab Chief Leggett but that she did see Defendant make slashing motions and run away.

The State then called Councilman Dale Joseph Ducote (Ducote) to the stand. Ducote testified that on the day of the incident, he was at a city council meeting with Chief Leggett when Terry came into the meeting, mentioned a disturbance, and requested Chief Leggett's assistance. Ducote stated that he later took it upon himself to check on Chief Leggett since there were no other deputies around. Ducote said that the only people he saw at Defendant's residence were Chief Leggett and Defendant, who appeared to be having a conversation. Chief Leggett was trying to get Defendant into the police car, but Defendant pulled away and walked behind his house. Ducote testified that he waited a few minutes before he followed them. Ducote said that when he got to the back of Defendant's residence, he observed Chief Leggett and Defendant "tussling against each other" while Chief Leggett was pleading with Defendant to get into the police car. Ducote said that Defendant pulled

away from Chief Leggett, turned, and came out with a knife. Ducote said that Defendant attempted to stab Chief Leggett with the knife more than once. Ducote testified that he saw "a striking motion[,] and then the knife came back up[,] and then I took off running toward them. And by the time I got there, he had come down again. That's when I [saw] the blood fly." Ducote said that after Defendant stabbed Chief Leggett, Defendant was still acting wild. Ducote further stated that when he tried to grab Defendant, Defendant jerked away and fell to the ground before he ran away. Ducote confirmed that Defendant did not say anything but simply stabbed Chief Leggett and ran. Ducote stated that after yelling for assistance, he ran after Defendant, who ran through the woods beyond his house.

First degree murder of a peace offer is defined as the killing of a human being "when the offender has a specific intent to kill or to inflict great bodily harm upon a . . . peace officer . . . engaged in the performance of his lawful duties[.]" La.R.S. 14:30(2). An attempt occurs when a person, "having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object. . .; and it shall be immaterial whether . . . he would have actually accomplished his purposes." La.R.S. 14:27(A). "Specific criminal intent to kill is a required element of the crime of attempted murder." *State v. Holder*, 12-258, p. 8 (La.App. 3 Cir. 11/7/12), 101 So.3d 1059, 1064, *writ denied*, 13-659 (La. 10/25/13), 124 So.3d 1091. "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant." *State v. Reed*, 45,237, p. 6 (La.App. 2 Cir. 5/26/10), 37 So.3d 1116, 1120. "The determination of whether the requisite

9

intent is present in a criminal case is for the trier of fact, and a review of this determination is to be guided by the standards of *Jackson*[.]" *State v. Linnear*, 44,830, p. 6 (La.App. 2 Cir. 12/9/09), 26 So.3d 303, 306.

Defendant argues that he did not threaten Chief Leggett and that the State did not present any evidence that he threatened Chief Leggett. Defendant argues that there was no evidence that he had any ill will toward Chief Leggett in the past. He argues that specific intent to kill cannot be inferred from the specific circumstances of this offense or from his conduct in this case.

This court has found that "the act of pointing a gun at a person and firing the gun is an indication of the intent to kill that person." *State v. Thomas*, 10-269, p. 7 (La.App. 3 Cir. 10/6/10), 48 So.3d 1210, 1215, *writ denied*, 10-2527 (La. 4/1/11), 60 So.3d 1248, *cert. denied*, *Thomas v. Louisiana*, 565 U.S. 859, 132 S.Ct. 196, (2011). Defendant argues that the same cannot be said of a knife strike. Additionally, Defendant argues that the testimony made clear that he did not repeatedly stab Chief Leggett but only made contact with Chief Leggett's face a single time. Defendant argues that if he had the intent to kill, he could have stayed and continued to stab Chief Leggett until Chief Leggett died.

In *State v. Bishop*, 01-2548 (La. 1/14/03), 835 So.2d 434, the defendant was charged with attempted second degree murder after he beat the victim severely, hitting and kicking him in the face and cutting him in the groin area. A second man hit the victim in the head and cut him in the upper thigh area, and the two left the victim in the bushes. A physician testified that more than seventy percent of the bones in the victim's face had been broken. While the broken facial bones were not life threatening, "the cumulative effect of the injuries and their complications" put the victim in danger of dying. *Id*. at 436. The appellate court held that the State

failed to prove that the defendant had the specific intent to kill the victim. The Louisiana Supreme Court reversed and found specific intent to kill based on the following: (1) the two men brutally attacked the victim and attempted to castrate him; (2) the men left the victim in the bushes for over ninety minutes and used a ruse to discourage those who passed by from going into that area; and (3) the defendant's actions prevented the victim from receiving medical attention. The Louisiana Supreme Court determined that "the state certainly presented sufficient evidence to prove defendant possessed the requisite specific intent to kill" and that a jury could have rationally concluded that the defendant had the specific intent to kill even though he did not complete his objective. *Id*. at 438.

In *State v. Jordan*, 44,495, p. 5 (La.App. 2 Cir. 8/19/09) (unpublished opinion), *writ denied*, 09-2083 (La. 4/5/10), 31 So.3d 356, the second circuit found sufficient evidence for attempted second degree murder and held:

> Viewed in the light most favorable to the prosecution, the record in this case amply supports the trier of fact's conclusion that the defendant had the specific intent to kill Ms. Woods and committed an act to accomplish that goal. According to Ms. Woods, the defendant struck her without warning in that he stabbed her in the chest and punctured her lung. The defendant's specific intent to kill Ms. Woods could be discerned from the fact that he stabbed her in the chest with sufficient force to puncture her left lung, and he attempted to strike additional blows which Ms. Woods deflected with her elbow. Furthermore, the evidence indicates that the defendant's attack only ended because he was interrupted by the actions of Ms. Scott. Ms. Woods was hospitalized for two weeks as a result of her wounds. *Cf. State v. Davis*, 41,245 (La.App. 2 Cir. 8/9/06), 937 So.2d 5.

Defendant stabbed Chief Leggett with enough force to slice the muscle in Chief Leggett's face in half, which caused damage to his nerves. Defendant notes that the alleged weapon, the pocketknife, was found by one of the non-testifying officers but was never shown to the jury or admitted into evidence. However, even though the weapon was not introduced into evidence, there was ample testimonial

11

evidence and physical evidence from which a jury could reasonably conclude that a knife was in fact the weapon used in the stabbing. *State v. Dean*, 528 So.2d 679 (La.App. 2 Cir. 1988).

Defendant claims that there was evidence that he behaved erratically, such as failing to respond to Chief Leggett, pacing in several areas of the property, and making odd comments prior to the incident. Defendant claims that he was having an episode when Chief Leggett attempted to detain him and that he had no way of knowing what Ducote's intentions were when Ducote stepped in. Defendant claims that he was in a panic and was only trying to get away. Defendant concludes by asserting that his case was highly publicized and highly political. While Defendant concedes that Chief Leggett suffered extreme injury, Defendant argues that the State failed to present any evidence to establish the specific intent to kill. For these reasons, Defendant argues that his conviction must be reversed.

We disagree and find that the evidence was sufficient to convict Defendant of attempted first degree murder. The testimony from the witnesses indicates that Defendant initially resisted being taken into custody but appeared to surrender. Then, while being led by Chief Leggett, Defendant pulled away, removed a knife from his pocket, turned, and severely wounded Chief Leggett on the left side of his face and collar bone area. Ducote testified that he believed that Defendant would have continued to stab Chief Leggett had Ducote not intervened. Defendant fled to svoid being apprehended. The use of a knife does not preclude the fact that Defendant had the specific intent to kill. The intent to kill was evidenced from the severity of the wound, the profuse amount of blood lost, and the need for emergency medical treatment.

12

When viewed in the light most favorable to the prosecution, the record in this case supports the trier of fact's conclusion that Defendant had the specific intent to kill Chief Leggett and committed an act to accomplish that goal. The jury found the State's witnesses to be credible and believed their recitation of the events. We will not disturb the jury's credibility determinations, as a reasonable jury could have found that the State proved beyond a reasonable doubt that Defendant had the specific intent to kill Chief Leggett. This court affirms Defendant's conviction for attempted first degree murder.

*Denial of Motion for Continuance*

Defendant argues that the trial court abused its discretion in failing to grant the motion for continuance, which was filed orally on the morning of trial and later supplemented with a written motion.[1] Defense counsel claimed that they were provided with outstanding discovery on the day of trial. The discovery included: audio recordings of three 911 calls placed by the witnesses; body camera footage noted in police reports; and new photographs, which the State did not intend to enter into evidence. The defense also claimed that the State had filed a bill of information charging the lead detective, Timothy Stelly, with malfeasance in office. The alleged malfeasance in office occurred after Defendant's arrest. The defense claimed that it did not know if Stelly's actions had any impact on Defendant's case. Counsel claimed that, had they known of this claim, they would have subpoenaed Stelly's internal personnel file and requested the full police report. Counsel claimed that Defendant suffered prejudice that should result in reversal of his conviction since they were unable to review the State's discovery before jury selection.

---

[1] Louisiana Code of Criminal Procedure Article 707 requires that a motion for continuance be filed in writing seven days prior to the commencement of trial.

At the hearing on the oral motion for continuance, Alex Chapman (Chapman) indicated that he was Defendant's original attorney and that he was appointed by the trial court in 2018. In September of 2019, Trish Ward (Ward) took over Chapman's cases. Ward spoke on the record about needing time to review the discovery. Ward also stated that she inherited the entirety of Chapman's case load and admitted that she was still catching up.

Defense counsel argues that open file discovery does not alleviate the State's burden to timely provide subsequent discovery and that the defense was specifically prejudiced in not having sufficient time to review the evidence provided by the State on the morning of trial. Therefore, Defendant argues that the trial court abused its discretion in failing to grant the motion for continuance and that his conviction should be reversed.

The State argues that a review of its file in advance of trial would have revealed that calls were made to 911 and would have also revealed the names of any officers involved in the investigation of the stabbing. The State argues that defense counsel could have subpoenaed any witnesses deemed necessary to the defense and made any requests to the State for anything under the State's control. For these reasons, the State argues that the trial court correctly concluded that defense counsel failed to prove any legal grounds that would warrant a continuance.

In denying the oral motion for a continuance, the trial court outlined the relevant procedural history of the case and found that there was no prejudice and/or surprise as to Defendant. The trial court further found that the defense had "more than ample and sufficient time and opportunity to meet, plan and prepare for the trial scheduled for today, . . . two years approximately[.]" The court concluded that

14

Defendant "failed to provide[] any evidence as to any of the grounds required by law[.]"

Pursuant to La.Code Crim.P. art. 712, "a motion for continuance, if timely filed, may be granted, in the discretion of the court, in any case if there is good ground therefor." In *State v. Butler*, 53,360, pp. 22-23 (La.App. 2 Cir. 4/22/20), 293 So.3d 808, 821, *writ denied*, 20-798 (La. 11/10/20), 303 So.3d 1039 (citations omitted), the second circuit provided a concise summary on the law of motions for continuances:

> Because the decision to grant or deny a motion for continuance rests within the sound discretion of the trial court, a reviewing court will not disturb the trial court's determination absent a clear abuse of discretion. Generally, a reviewing court will not reverse a conviction even on a showing of an improper denial of a motion for a continuance, absent a showing of specific prejudice.
>
> The reasonableness of discretion issue turns primarily upon the circumstances of the particular case.

In *State v. Harris*, 01-2730, p. 15 (La. 1/19/05), 892 So.2d 1238, 1250, *cert. denied*, 546 U.S. 848, 126 S.Ct. 102 (2005), the Louisiana Supreme Court held that "[l]ate disclosure as well as non-disclosure of evidence favorable to the defendant requires reversal if it has significantly impacted the defendant's opportunity to present the material effectively in its case and compromised the fundamental fairness of the trial." Any impact of the late disclosure on the defense "must be evaluated in the context of the entire record." *State v. Kemp*, 00-2228, p. 7 (La. 10/15/02), 828 So.2d 540, 545.

We find that the trial court did not err in denying the motion for continuance. The trial court granted multiple continuances, which gave the defense nearly two years to prepare their case. The State had an open file policy, which was noted on the record in 2018, and defense counsel had access to this open file. Furthermore,

even if the outstanding discovery was favorable evidence to Defendant, Defendant has not shown how the late disclosure and/or non-disclosure compromised the fundamental fairness of the trial. Although Defendant alleges that "the defense suffered specific prejudice in not having adequate time to review the evidence provided by the State on the morning of trial[,]" he does not state the specific prejudice. Therefore, we find that Defendant has not demonstrated how he was prejudiced by the trial court's denial of his motion for continuance. This assignment of error is without merit.

*Sentencing*

Defendant argues that the trial court imposed an excessive sentence by sentencing him to forty-five years without benefits. We need not reach the excessive sentence claim because we find that the sentence must be vacated due to the trial court's failure to observe the twenty-four hour sentencing delay required by La.Code Crim.P. art. 873.

A verdict was rendered in this case on January 23, 2020. The trial court indicated that the motions for new trial and for post-verdict judgment of acquittal were filed the same date as the sentencing hearing was set and asked if either party objected to the motions being heard. The State lodged an objection, but the trial court indicated that it would hear the motions. The original sentencing date was April 20, 2020, but Defendant was not sentenced until March 15, 2021. The State asserts that this significant delay occurred because of Covid-19.

On March 15, 2021, following arguments, the trial court denied the motions and stated that it was ready to proceed with the sentencing hearing. The court did not ask the defense if it waived delays, and the defense did not waive delays on its own. The trial court then proceeded with the sentencing hearing and sentenced

Defendant to forty-five years at hard labor without benefit of probation, parole, or suspension of sentence.

The State argues that Defendant's sentence should not be vacated since there was an ample delay between conviction and sentencing. Defendant asserts that his sentence should be vacated because he did not waive the sentencing delay and also challenges his sentence as excessive.

Louisiana Code of Criminal Procedure Article 873 requires a minimum twenty-four hour delay between the denial of a motion for new trial or motion in arrest of judgment and sentencing unless there is an express waiver of the delay. The Louisiana Supreme Court has held that the failure to waive the twenty-four hour period is grounds to void a defendant's sentence if the sentence is attacked. *State v. Augustine*, 555 So.2d 1331 (La.1990). Where a defendant does not waive the delay, failure to observe the delay is not harmless when a defendant challenges his sentence. *State v. Francis*, 09-227 (La. 4/29/19), 268 So.3d 289 (per curiam).

In *State v. Kisack*, 16-797, p. 7 (La. 10/18/17), 236 So.3d 1201, 1205 (*per curiam*), *cert. denied*, ___ U.S. ___, 138 S. Ct. 1175 (2018), the Louisiana Supreme Court found that defense counsel's participation in the sentencing hearing was insufficient to constitute a waiver of the delay required by Article 873 because "[a]n implicit waiver . . . runs afoul of the plain language of Art. 873 that requires that the waiver be expressly made." In *State v. Carter*, 14-742, p. 15 (La. App. 1 Cir. 3/25/15), 167 So.3d 970, 979, the court stated that "[a]s a general rule, when a defendant challenges a non-mandatory sentence, and the delay is not waived, the defendant's sentence must be vacated and the matter remanded for resentencing."

Thus, Defendant's sentence must be vacated and the case remanded for resentencing.

*Ineffective Assistance of Counsel*

To establish an ineffective assistance of counsel claim, a petitioner must show that: (1) his defense counsel's performance was deficient, which requires a showing that counsel's errors were so serious that he failed to function as that "counsel" guaranteed by the Sixth Amendment; and (2) the deficient performance so prejudiced the defense that the defendant was deprived of a fair trial, which is one "whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984). Both showings must be made before it can be found that the defendant's conviction "resulted from a breakdown in the adversary process that render[ed] the trial result unreliable." *Id*. The proper standard for attorney performance is not perfect assistance. Rather, it is "reasonably effective assistance" of counsel. *Id*.

An accused cannot prove ineffective assistance of counsel by merely making allegations of ineffectiveness. Instead, "the accused must couple these allegations with a *specific showing of prejudice*." *State v. James*, 95-962, p. 5 (La.App. 3 Cir. 2/14/96), 670 So.2d 461, 465 (emphasis in original). In order to determine whether the alleged ineffectiveness prejudiced the defendant, the defendant "must show that but for counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different." *State v. Jones*, 33,657, p. 11 (La.App. 2 Cir. 8/23/00), 765 So.2d 1191, 1199, *writ denied*, 00-2779 (La. 6/29/01), 794 So.2d 825.

In *State v. McKinney*, 19-380, pp. 9-10 (La.App. 5 Cir. 12/26/19), 289 So.3d 153, 162, the fifth circuit held:

> In order to prevail, the accused must overcome a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; specifically, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

> *Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. at 2065. An alleged error that is within the ambit of trial strategy does not establish ineffective assistance of counsel because "opinions may differ on the advisability of such a tactic." *State v. Singleton*, 05-634 (La.App. 5 Cir. 2/14/06), 923 So.2d 803, 811, *writs denied*, 06-1208 (La. 11/17/06), 942 So.2d 532 and 08-2386 (La. 1/30/09), 999 So.2d 753.

Defendant argues that neither of his two public defenders provided effective representation. Defendant contends that both of his attorneys submitted that they were not prepared for trial and that neither attorney spent sufficient time conferring with him. Defendant claims that even the State pointed out that nothing prevented the defense attorneys from going to the prison facility and meeting with their client.

Upon examining the record, both Chapman and Ward requested a continuance because they believed that the quality of their representation would benefit from a continuance. The trial court denied the continuance. However, before Chapman made the request for a continuance, he acknowledged that both he and Ward were able to communicate with Defendant on more than one occasion. Chapman indicated that he theorized an insanity defense because Defendant was unable to understand right from wrong at the time of the crime and claimed to hear voices and have hallucinations. A psychologist from Lafayette met with Defendant, reviewed the files, and determined that there was a drug component. Based on the psychological evaluation, Chapman made the decision to abandon that defense. Chapman stated that there were no serious plea negotiations going on at that time because he was exploring the insanity defense. Chapman said that during the week of January 21, 2020, he visited with Defendant, gained Defendant's trust, communicated with him, and discussed plea bargains. Chapman stated that just before the hearing on January 21, he met with Defendant and Defendant's mother to discuss plea bargains.

Defendant also notes that his counsel attempted to file a motion for an adverse presumption of missing evidence because the State failed to produce the pocketknife or a photo of it for trial. Defendant argues that the law did not support the motion and that the correct action would have been for his counsel to request the evidence and to subpoena the witness to authenticate it. Defendant asserts that his counsel's failure to take appropriate action is not trial strategy, that his counsel's performance was deficient, and that this deficiency prejudiced him.

Defendant makes general assertions about his counsels' lack of preparation but does not specifically identify any exculpatory evidence that they were unable to uncover because they had insufficient time to prepare for trial. Defendant also makes a generalized claim that his attorneys did not spend sufficient time with him, but the record reflects that Defendant's attorneys met with him several times and explored a possible insanity defense. Defendant has not provided any information as to what he would have told his attorneys had they spent more time with him.

Ultimately counsel's chosen strategy was unsuccessful, but "[t]he choice of what defense to employ is perhaps the hallmark of the type of act for which *Strickland* requires that judicial scrutiny be highly deferential and for which there is a strong presumption that the decision was a function of reasonable professional judgment." *State v. Stallworth*, 08-1389, pp. 10-11 (La.App. 4 Cir. 4/29/09), 11 So.3d 541, 547, *writ denied*, 09-1186 (La. 1/29/10), 25 So.3d 829. "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. This court finds that Defendant's

20

general assertion that his attorneys were unprepared is insufficient to satisfy the two-pronged *Strickland* test for establishing ineffective assistance of counsel.

Defendant also notes that the defense filed a writ application with this court to request review of the trial court's denial of the motion for continuance; however, the writ application was denied as deficient. *State v. Deville*, 20-58 (La.App. 3 Cir. 1/22/20) (unpublished writ decision). Defendant argues that his counsel did not provide any of the required documentation with the writ application. Defendant asserts that "[h]ad counsel provided the minutes or the transcript, this court could have granted a stay, which may have resulted in a reversal of the trial court's denial of the continuance[] and would have given trial counsel additional time to review the State's late discovery evidence." However, Defendant has raised an assignment of error regarding the trial court's denial of his motion for continuance in this appeal, and we have found that claim to be without merit. Since Defendant's chief claim is without merit, Defendant's ineffective assistance claim is also without merit. *State v. Dressner*, 18-828 (La. 10/29/18), 255 So.3d 537, *cert. denied*, __ U.S. __, 139 S.Ct. 2691 (2019).

Lastly, Defendant argues that his counsel failed to establish and argue the defense of voluntary intoxication, which would have negated the specific intent required for attempted first degree murder. Under La.R.S. 14:15(2), voluntary intoxication constitutes a defense "[w]here the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent . . . required in a particular crime[.]" "[A] defendant has the burden of providing his intoxication defense; thereafter, it falls to the State to negate that defense by showing beyond a reasonable doubt that specific intent was present

21

despite the defendant's alleged intoxication." *State v. Mickelson*, 12-2539, p. 7 (La. 9/3/14), 149 So.3d 178, 183.

Defendant argues that the record contains sufficient evidence to prove that he was intoxicated. Defendant asserts that Chief Leggett provided a written statement that Defendant was on drugs at the time of the subject incident and that Defendant admitted that he was on marijuana. Defendant also asserts that Chad Chaddrick (Chaddrick) gave a written statement that he heard "TK" [Terry King] and Defendant arguing in the road and asked what was going on. Chaddrick wrote that Defendant responded that Defendant heard voices in the house or in the woods and went to check if everyone was okay. Chaddrick further wrote that Defendant said that he was "messed up on marijuana and . . . that he hoped . . . he didn't trip out and do something stupid." Defendant further asserts that Bubba gave a written statement, which indicated that Defendant "was in his yard flipping out [and] hollering someone poured gas in his house [and that] he was being held at gunpoint. There was no other person present at his residence."

Defendant argues that his counsel failed to explore Chief Leggett's statement regarding Defendant's intoxication. Additionally, Defendant claims that neither Chaddrick nor the officer who took the statements was subpoenaed for trial by the defense, so the statements were not admitted. Defendant also notes that Bubba changed his statement at trial to indicate that Defendant said that someone had a gun in the house rather than that Defendant said that he was being held at gunpoint. Defendant argues that his counsel did not effectively impeach Bubba and that impeachment may have been easier had counsel subpoenaed the officers involved.

22

Defendant argues that he was deprived of a fair trial and that there is a reasonable probability that the jury would have returned a lesser verdict had his attorneys called the witnesses and presented the evidence.

The State argues that defense counsel was not ineffective for failing to raise intoxication as a defense. The State argues that Defendant would have failed to meet his burden of showing that his intoxication precluded the requisite specific intent to kill because the evidence showed that Defendant tried to deceive Chief Leggett by agreeing to be taken into custody but seized the opportunity to pull a knife from his pocket, turn on the chief, and injure him severely. Then, Defendant was of the mind to flee the scene toward a wooded area to avoid being apprehended. The State argues that it proved specific intent to kill and that an effective prosecutorial case should not form the basis for an ineffective assistance of counsel claim.

Generally, the issue of ineffective assistance of counsel is a matter more properly addressed in an application for post-conviction relief in the trial court where a full evidentiary hearing can be conducted. *State v. Prudholm*, 446 So.2d 729 (La.1984). Only if the record discloses sufficient evidence to rule on the merits of the claim do the interests of judicial economy justify consideration of the issues on appeal. *State v. Seiss*, 428 So.2d 444 (La.1983).

As indicated from the case law above, there is a strong presumption that counsel's conduct falls within the range of reasonable professional assistance and trial strategy. However, we find that this claim regarding the intoxication defense is relegated to post-conviction relief where a full evidentiary hearing can be conducted. At such a hearing, Defendant's counsel will be able to testify about their strategy and their decisions regarding the witnesses.

# V.

## <u>CONCLUSION</u>

Defendant's conviction for attempted first degree murder is hereby affirmed. Because the trial court failed to comply with the sentencing delay provided by La.Code Crim.P. art. 873, Defendant's sentence is vacated, and the matter is remanded to the trial court for resentencing. Finally, Defendant's ineffective assistance of counsel claim regarding the failure to argue and call witnesses in support of the defense of voluntary intoxication to negate specific intent to kill is relegated to post-conviction relief where a full evidentiary hearing can be conducted.

**CONVICTION AFFIRMED.**
**SENTENCE VACATED AND CASE REMANDED FOR RESENTENCING.**